COALITION AGAINST LINCOLN WEST, INC., et al., Respondents-Appellants, v CITY OF NEW YORK et al., Appellants-Respondents.

First Department, July 7, 1983

APPEARANCES OF COUNSEL

*Bruce J. Terris* of counsel (*Jack Auspitz, Nathalie V. Black* and *Monica Blong Wagner* with him on the brief; *Parker, Auspitz, Neesemann, & Delehanty* and *Terris & Sunderland,* attorneys), for respondents-appellants.

*Judah Gribetz* of counsel (*Douglas M. Parker, Jed S. Rakoff, Harold R. Tyler, Jr., Gregory L. Diskant, Owen McGivern* and *Frank S. Ioppolo* with him on the brief; *Mudge Rose Guthrie Alexander & Ferdon* and *Patterson,*

*Belknap, Webb & Tyler* and *Donovan Leisure Newton & Irvine,* attorneys), for Lincoln West Associates, appellant-respondent.

*Marvin Kwatler* of counsel (*Leonard Koerner, Stephen Kramer* and *Stephen J. McGrath* with him on the brief; *Frederick A.O. Schwarz, Jr., Corporation Counsel,* attorney), for municipal appellants-respondents.

OPINION OF THE COURT

Ross, J. P.

The New York City Board of Estimate (Board), on September 16, 1982, with one dissenter, approved resolutions which permit respondent Lincoln West Associates (LWA), a private developer, to construct a large-scale residential and commercial project on the site of the so-called "60th Street Penn Yards".

Beginning in the early 1960's, with the bankruptcy of the New York Central Railroad, and continuing up to the present, this site has been a decaying eyesore. Occupied by an inactive railroad yard, it is cluttered with obsolete or abandoned equipment, dilapidated structures and a large accumulation of refuse. The total site comprises 76.4 acres on the west side of Manhattan. It extends from 59th Street to 72nd Street.

LWA obtained a purchase option from the owner of the site in the spring of 1980. Before LWA expressed interest in the site, there had been a number of plans presented for the utilization of this site; but, none of them came to fruition since each proved to be unfeasible.

In September, 1980, LWA commenced informal meetings with governmental agencies, as well as with Community Board (CB) No. 7. Most of the area encompassed by the site is represented by CB No. 7. The purpose of these meetings was to promote the compatibility of the proposed project with existing public policies and community goals. On January 20, 1981 representatives of LWA met with representatives of the New York City Departments of City Planning and Environmental Protection to discuss with them the details of the environmental impact statement (EIS) that was necessary.

Pursuant to Executive Order No. 91, section 1 (k), issued by the Mayor of New York City and in accordance with 6 NYCRR part 617, the Departments of City Planning and Environmental Protection have been designated as the colead agencies with the responsibility of implementing the provisions of the City Environmental Quality Review (CEQR) and the State Environmental Quality Review Act (SEQRA).[1]

SEQRA is modeled upon the Federal environmental statute known as the National Environmental Policy Act of 1969 (NEPA).[2] The purpose of SEQRA is:[3] "to declare a state policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and enhance human and community resources; and to enrich the understanding of the ecological systems, natural, human and community resources important to the people of the state."

These two lead agencies informed LWA what, in their opinions, the EIS should contain to meet the requirement of CEQR and SEQRA. On the one hand, the Department of City Planning reviews the following factors to ascertain appropriateness of the proposal: land use; project design; impact on surrounding community; neighborhood character and affected landmarks; project density and impact on population density; and, impact on transportation and traffic flow. On the other hand, the Department of Environmental Protection reviews impact on air; noise; water quality; and, infrastructure, i.e., sewage, drainage and waste.

In *Matter of Town of Henrietta v Department of Environmental Conservation of State of N. Y.* (76 AD2d 215, 220) the court wrote: "An EIS is intended to provide detailed information about the effect which the proposed action is likely to have on the environment, to list ways in which any adverse effects of such an action might be minimized, and to suggest alternatives to such an action so as to form the basis for a decision whether or not to undertake or

1. SEQRA was adopted in 1975. Its provisions are found in ECL 8-0101-8-0117.
2. The provisions of NEPA are found in US Code, tit 42, § 4321 *et seq.*
3. ECL 8-0101.

approve such action. The EIS, the heart of SEQRA, clearly is meant to be more than a simple disclosure statement * * * Rather, it is to be viewed as an environmental 'alarm bell' whose purpose is to alert responsible public officials to environmental changes before they have reached ecological points of no return".

Thereafter, LWA undertook, through McKeown & Franz, Inc., who were LWA's environmental consultants, and a variety of subcontractors, who were experts in the relevant disciplines, to prepare a draft EIS (DEIS). From January to June, 1981, members of the technical bureaus of the lead agencies regularly met with the technical personnel of LWA to discuss the scope of the DEIS and the kind of methodologies which were to be used to evaluate possible environmental impact.

In August, 1981, McKeown & Franz, Inc., submitted a preliminary DEIS to the lead agencies for examination. Besides having their own examiners look at the DEIS, these agencies also sent copies to other interested departments and agencies of the city.[4] As a result of requests for more information from the city's experts, LWA updated, revised, and resubmitted the DEIS in November, 1981. After the revised DEIS was approved by the lead agencies as conforming to the requirements of SEQRA and CEQR, it was then made available for public inspection and comment on November 16, 1981.

Joseph W. Ketas, who in November, 1981 was the Director of the Environmental Management Division of the Department of City Planning, swore, in an affidavit that appears at pages 261-283 of the record, that "the DEIS was among the most detailed and comprehensive environmental documents this agency has reviewed." Also, Dr. Mira Ledman, who, in November, 1981, was the Director of the Office of Environmental Impact in the New York City Department of Environmental Protection, swore, in an

---

4. The preliminary DEIS was distributed to five technical divisions of the Department of City Planning: Housing, Transportation, Manhattan Office, Human Resources and Zoning. In addition, copies were sent to the Departments of Transportation, Ports and Terminals, Parks and Recreation, Housing Preservation and Development; the Landmarks Preservation Commission; and the Mayor's Offices of Rail Freight and Single Room Occupancy Hotels.

affidavit that appears at pages 284-301 of the record, that "the DEIS adequately discloses all significant environmental impacts, including the anticipated impacts upon geology, hydrology, aquatic and terrestrial ecology, water quality and supply, sewage disposal, air and noise quality and demand for utilities * * * In addition to identifying the potential environmental impacts of Lincoln West, the DEIS also sets forth measures which would serve to mitigate or reduce the projected impacts."

As mentioned *supra,* in January, 1981, LWA had contacted CB No. 7. On January 26, 1981, LWA held a major community meeting, which resulted in public reaction, the sentiments of which LWA incorporated in the project design in order to accommodate community concerns and preferences. Subsequently, at another large public meeting, on May 18, 1981, these changes in the revised design were presented by LWA for public review; and, suggestions and comments received at this meeting were incorporated into the project design.

Before the late fall of 1981 submission of the DEIS to the lead agencies, LWA, in September, 1981 had applied to the City Planning Commission (CPC) for: (a) a zoning map change of the subject site from manufacturing districts to commercial and residential districts, consistent with the zoning designation of the surrounding neighborhood; (b) a city map change to reflect the establishment of a street grid system, easements, park additions or recreational areas, a marginal street or wharf, the elimination of a portion of Twelfth Avenue, and the delineation of various easements within the boundaries of the site; and, (c) special permits and authorizations, which were sought to accomplish such things as facilitating the proposed mixed use development on a platform above the "60th Street Yards", as allowing for the appropriate distribution of density throughout the project, and for off-street parking. On November 23, 1981, the applications for the zoning map amendment, the city map change and special permits were certified by CPC as complete, in accordance with article 3 of the Uniform Land Use Review Procedure (ULURP) and, as required by ULURP, were sent to CB No. 7 and adjacent CB No. 4 for their consideration. Both Boards held public

hearings in February, 1982 and voted to recommend disapproval. Thereafter, pursuant to article 5 of ULURP, the proposed applications were forwarded to the Borough Board for review and it took no action at that time.

Subsequently on March 24, 1982, CPC held public hearings on the subjects of: (1) LWA's requests for the zoning map change, city map change and the special permits and applications; and, (2) on a related zoning resolution amendment.[5] Present at the hearings were representatives of LWA, as well as members of the community, public officials and other interested persons, who spoke for and against this project.

Prior to these hearings, the CPC had published notice of these hearings in the Comprehensive City Planning Calendar and in the *City Record.* Also CPC had published the full text of the zoning text amendment and its revision.

In addition to holding hearings on March 24, 1982, CPC also issued a public statement. This statement advised the public that the city had requested LWA to withdraw its pending applications submitted to the CPC, mentioned *supra,* so that further study could be undertaken as to the feasibility of including a Trailor-on-Flat-Car (TOFC) facility in the project. LWA complied with the city's request and withdrew its applications. Then on April 6, 1982 the CPC recertified as complete, in accord with ULURP's provisions, these three applications of LWA and forwarded the items to CB No. 7 and No. 4. During the period from May 27 through July 13, 1982, both Boards held public hearings and again voted to recommend disapproval of the resubmitted LWA applications. In June, 1982, pursuant to advance notice, CPC held further public hearings on the resubmitted applications and another hearing on the proposed zoning amendment.

Finally, on July 19, 1982, CPC adopted resolutions to amend the zoning resolution, amend the zoning map,

---

5. This zoning resolution amendment was entitled "Developments Over Certain Rights-of-Way or Yards". While the map change amendments and special permit applications were being reviewed by CPC in accordance with section 197-c of the New York City Charter, the zoning resolution amendment was being reviewed in accordance with section 200 of that charter. Incidentally, the ULURP procedure only applied to the section 197-c review.

amend the city map and to approve the special permit applications. CPC conditioned its approval upon LWA's execution of a restrictive declaration, which would insure the development and use of the project in accordance with the proposed plans. Public participation, including that of CB No. 7 and CB No. 4, concerning the conditions to be imposed on the proposed project by means of the restrictive declaration, had begun before this final action had been taken by CPC and continued after CPC took its final action and did not end until the Board took its final action in September, 1982. As a result of the public's views, negotiations were entered into and modifications were caused to be made in this declaration. In substance, the final modifications, which are set forth in a letter dated September 16, 1982, from the Chairman of CPC to the Board, include: (a) a further reduction in the scale of the project from 4,700 units to 4,300 units; (b) a provision that any major modification of the declaration would be reviewed in a process similar to ULURP; and, (c) a commitment by LWA to provide an additional $1.5 million to be used for the renovation of the 66th Street IRT subway station.

Upon the basis of the restrictive declaration, the Board, after holding its own public hearings in August and September, 1982, adopted resolutions which amended the zoning map, amended the grant of special permits and amended the text of the zoning resolution. Also, the Board approved the changes to the city map, subject to the execution of a mapping agreement between the city and LWA.

While LWA's applications to CPC were being considered, as discussed *supra,* LWA's environmental consultants, McKeown & Franz, Inc., continued to receive and analyze the comments on the DEIS made by the lead agencies and the public and prepared responses to them. Then the lead agencies held public hearings on the DEIS, pursuant to section 10 of the CEQR, on June 16, 1982 and June 29, 1982. The public comment period was closed 10 days after the last public hearing of June 29, 1982. LWA's McKeown & Franz, Inc., now submitted to the lead agencies the final EIS (FEIS), which was contained in three volumes. This FEIS reflected revisions and updating of the DEIS, based upon further review by the lead agencies as well as com-

ments received during the public comment period and as a result of the public hearings held, mentioned *supra*.

The lead agencies certified that the FEIS met the substantive requirements of the CEQR on July 9, 1982; and, made the FEIS available for public inspection. As mentioned above, the Board approved the project on September 16, 1982, upon the conditions mentioned *supra*.

Subsequent to Board approval, on September 17, 1982 LWA took title to the northern half of the site; and, on December 8, 1982 LWA took title to the southern half of the site.

The city's position in respect to the project is summed up in these words by the Chairman of the CPC: "As Chairman of the City Planning Commission, I participated fully in the City's consideration of the Lincoln West Project, from the time of the initial proposal in January 1981, until the approval of the project by the Board of Estimate on September 16, 1982 * * * Lincoln West will transform a large, deteriorated and grossly underutilized parcel of privately-owned property into a well-planned development providing housing, parkland and employment for City residents * * * The project will convert the site to its highest and best use * * * Consistent with modern planning techniques and knowledge, the sponsors have agreed to provide a significant number of mitigation measures and amenities to minimize the project's environmental consequences * * * The Lincoln West proposal was reviewed by the Department of City Planning and the City Planning Commission over a period of nearly two years * * * The environmental and uniform land use review processes enabled the public to have input into the ultimate shaping of the proposal."

Three days short of four months after the Board's approval of the project, by notice dated January 13, 1983 petitioners instituted a CPLR article 78 proceeding to review and annul the Board's approval. The petitioners include a coalition of Upper West Side groups, as well as community leaders and locally elected legislators. The petition contains eight causes of action. Also, the petition-

ers, as plaintiffs,[6] commenced, on the same date as the article 78 petition, a declaratory judgment action, by service of a summons and complaint. In the plenary action, the petitioners challenge the actions of the CPC and the Board in approving the amended zoning resolution, the map changes, and restrictive declaration. The causes of action in the plenary action are identical to those asserted in the special proceeding. The only difference is that in the plenary action the petitioners seek a declaratory judgment and injunctive relief.

In substance, in their pleadings, the petitioners contend that the respondent city agencies: (1) adopted a defective EIS; (2) improperly applied ULURP; and, (3) did not permit the public to participate in all phases of the decision-making process. Issue was joined.

Special Term granted the petition to the extent of vacating the EIS because the agencies concerned did not consider the alternative of developing only the northern half of the site.[7] We disagree.

It is undisputed that Special Term reached its decision upon the basis of an error of fact. Special Term assumed that LWA only owned one half of the site, when in actuality it owned the whole site. Thus, neither the parties nor the public suggested this alternative. Our review of this six-volume record reveals that the city agencies, both administrative and legislative, in carrying out their responsibilities under SEQRA, ULURP and in approving the EIS "reasonably exercised [their] discretion * * * [because they] identified the relevant areas of environmental concern [and] took a 'hard look' at them * * * and made a 'reasoned elaboration' of the basis for [their] determination" (*H.O.M.E.S. v New York State Urban Dev. Corp.,* 69 AD2d 222, 231-232).

SEQRA does not require that every conceivable alternative must be considered before an EIS will be considered acceptable. "The degree of detail with which each alternative must be discussed will, of course, vary with the circumstances and nature of each proposal" (*Webster Assoc. v Town of Webster,* 59 NY2d 220, 228). Rather, the rule is

6. In order to avoid confusion the petitioners-plaintiffs will be referred to as petitioners even when referring to the plenary action.

7. When Special Term granted the petition, it dismissed the complaint as moot.

one of reasonableness and balance. "Examination of the record reveals that the determination is supported by substantial evidence * * * The final EIS, as thus constituted, was sufficient to meet the requirements of the law" (*Matter of Town of Candor v Flacke,* 82 AD2d 951-952). As was stated in *Matter of Town of Henrietta v Department of Environmental Conservation of State of N.Y.* (72 AD2d 215, 222, *supra*): "SEQRA * * * requires a decision maker to balance the benefits of a proposed project against its unavoidable environmental risks in determining whether to approve the project. While an EIS does not require a public agency to act in any particular manner, it constitutes evidence which must be considered by the public agency along with other evidence which may be presented to such agency * * * Thus the general substantive policy of the act is a flexible one. It leaves room for a reasonable exercise of discretion and does not require particular substantive results in particular problematic instances."

We find that all the steps required by State law concerning public scrutiny of the FEIS have been complied with.

"So long as the officials and agencies have taken [a] 'hard look' at environmental consequences * * * the court does not seek to impose unreasonable extremes or to interject itself within the area of discretion of the executive as to the choice of the action to be taken" (*National Resources Defense Council v Morton,* 458 F2d 827, 838). We find that the respondents have taken the prerequisite "hard look" and have adequately answered the questions of environmental concern and the petitioners' objections.

Further, we find that the respondents adequately considered viable alternatives to the LWA proposal. In fact, the review procedure actually resulted in a smaller number of residential units.

We do not believe that respondents must consider every possible alternative. What must be required is that information be considered which would permit a reasoned conclusion. In this case, the record indicates that respondents did consider a number of alternatives, including the TOFC proposal, to preserve a similar use to the long-abandoned freight yard, for the southern sector.

The trial court was correct when it acknowledged that the merits of LWA were not within the court's jurisdiction

upon the petition, but the only issue was "whether the City and its agencies have complied with the Law". We agree, and find the respondents have so complied.

The record indicates that respondents did adequately consider the environmental impact on the community, including, but not limited to water quality, sewage, private and public transportation, parking, air quality and the construction impact on noise and dust.

The trial court based its decision on an issue never raised by petitioners, and it is grounded on an assumption of fact that was obviously erroneous.

We find that the respondents' actions are based on an adequate EIS and complied with CEQR and SEQRA, as well as ULURP, and, therefore, the resolutions of the Board and CPC were properly adopted.

Further, petitioners argue that if the trial court's decision is not affirmed, we should remand so that there may be discovery for the purpose of amplifying the record. We hold that there is no need for such remand. The record is sufficiently complete so that this court can fully dispose of the matter.

We have considered the petitioners' remaining arguments and find them lacking in merit.

Accordingly, the order and judgment (one paper), Supreme Court, New York County (RICHARD W. WALLACH, J.), entered on April 11, 1983, which, *inter alia,* granted the petition annulling the determinations of respondents City Planning Commission and Board of Estimate and remanded for the filing of an amended environmental impact statement, should be modified, on the law, to the extent of dismissing the petition and otherwise affirmed, without costs.

CARRO, ASCH, MILONAS and KASSAL, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered on April 11, 1983, unanimously modified, on the law, to the extent of dismissing the petition and otherwise affirmed, without costs and without disbursements.