In the Matter of GOODSTEIN CONSTRUCTION CORP., DIC-UNDER-HILL INDUSTRIES and MILSTEIN PROPERTIES, a Joint Venture, Respondent, v ANTHONY GLIEDMAN, as Commissioner of the New York City Department of Housing Preservation and Development, et al., Appellants.

First Department, May 6, 1986

## APPEARANCES OF COUNSEL

*June A. Witterschein* of counsel *(Jeffrey Schanback* and *Leonard Koerner* with her on the brief; *Frederick A. O. Schwarz, Jr., Corporation Counsel,* attorney), for appellants.

*Charles G. Moerdler* of counsel *(Mark E. Klein* and *Elizabeth A. Mullins* with him on the brief; *Stroock & Stroock & Lavan,* attorneys), for respondent.

## OPINION OF THE COURT

Interlocutory order of the Supreme Court, New York County (Stanley S. Ostrau, J.), entered on January 4, 1985, which granted petitioner's application to the extent of directing a trial on the question of whether appellants acted arbitrarily in making a determination to de-designate petitioner as developer of the Washington Street Renewal Area, reversed, on the law, without costs, to strike the direction for a trial and dismiss the petition.

SANDLER, J. P. (concurring). In this CPLR article 78 proceeding, petitioner-respondent, a joint venture, seeks annulment, and certain ancillary relief, of a determination that de-designated it as developer of sites Nos. 5B and 5C in the Washington Street Urban Renewal Area (WSURA). Respondents-appellants, Anthony Gliedman, Commissioner of the New York City Department of Housing Preservation and Development (HPD), and the City of New York (City), appeal by permission of Special Term from an interlocutory order of the Supreme Court, New York County (Stanley S. Ostrau, J.), entered January 4, 1985, that granted the petition to the extent of directing a trial as to whether the challenged determination was arbitrary and capricious, and as to whether it represented a good-faith judgment.

The stated reason for de-designating petitioner-respondent as developer of the two sites was a governmental decision to change the land uses of the vacant city sites in question from those originally intended at the time petitioner-respondent was designated as a developer, and a further decision that the development of the areas in question in accordance with the revised land uses made desirable a different procedure for conveying the sites. We perceive no factual basis in the record for petitioner's claim that these governmental decisions affecting the use of city-owned lands were arbitrary or capricious. Nor do we perceive any factual basis for the claim that these

decisions did not represent a good-faith judgment reached by the responsible governmental officials in what they believed to be the best interests of the City.

The Washington Street Urban Renewal Area is comprised of 38.4 acres of city-owned land in the Tribeca section of downtown Manhattan. Site 5B comprises approximately 2.06 acres of land area, and is bounded on the north by Warren Street, on the east by Greenwich Street, on the south by Murray Street, and on the west by West Street. Site 5C comprises approximately 1.9 acres, and is bounded on the north by Chambers Street, on the east by Greenwich Street, on the south by Warren Street, and on the west by West Street.

In letters dated January 29 and February 1, 1982, respectively, after study of proposals submitted in response to requests for proposals (RFP) by HPD, HPD informed petitioner that it had been selected to negotiate exclusively with the City on the terms of disposition of sites Nos. 5B and 5C.

In accordance with the RFP for site No. 5C, the petitioner's proposal contemplated new multifamily residential buildings, and obligated the developer to submit plans for obtaining rent subsidies under the Federal Section 8 Housing Assistance Program. In accordance with the RFP for site No. 5B, petitioner's proposal provided in pertinent part for the construction of 1.1 million square feet of office space with associated retail space and parking. The letters of designation provided that the City could elect to renew the 90-day negotiating period in 30-day increments if, by the end of the initial 90-day period, the parties had not agreed on the terms of the land disposition agreement (LDA).

In letter agreements dated June 2, 1982, petitioner and HPD entered into new designation agreements with respect to the development of the sites. The agreement specified in considerable detail the responsibilities of the parties, and further provided that the terms and conditions set forth in the letter relative to the sale and development of the sites were to be merged into the LDAs.

As set forth in the letter agreements, during the exclusive negotiating period and any extensions of that period, the parties were to negotiate the terms and conditions in LDAs which were to contain all the terms, covenants and conditions relative to the sale and development of the sites. As here pertinent, petitioner was obligated under the agreement to

post as assurance deposits two letters of credit in the sum of $100,000 for each site, and to "continue to develop, at your sole risk, cost and expense, building designs, marketing concepts, massing studies and financial projections." Petitioner agreed that after the form and substance of the LDAs had been agreed upon, it would, at its sole cost and expense, fully and expeditiously cooperate with HPD in meeting the legal requirements for approval of the LDAs by the Board of Estimate, set forth in New York City Charter § 197-c (Uniform Land Use Review Procedure [ULURP]) and in the New York Urban Renewal Law (URL). In turn, HPD agreed to undertake and expeditiously complete all of its obligations in connection with the legal requirements, including the ULURP precertification process.

The petitioner alleges, and it is not disputed, that petitioner conscientiously and faithfully discharged the obligations it assumed under the agreements to bring to fruition the development of the two sites, expending time, money, effort and resources in that endeavor. Petitioner further alleges, and it is not disputed, that agreement was in fact reached on the terms of the LDAs.

In a letter dated November 29, 1983, HPD informed petitioner that its designation as developer of the two sites had been terminated, stating the reason for that action in the following words: "This action is being taken because of the City's interest in retaining and attracting back office jobs in New York City. Given the difficulty and time needed to assemble large parcels in Manhattan, the City has decided it is in the best interest of the City to reserve the Washington Market Urban Renewal Sites 1, 5B and 5C for commercial development by back office users, many of whom wish to construct their own buildings."

At a meeting on December 21, 1983 between representatives of the petitioner and Charles Reiss, Deputy Commissioner of HPD, the City restated the reasons originally given in the letter for the termination of petitioner's designation, agreeing that no fault had been found with petitioner's discharge of its obligations under the designation agreements. In a further meeting between petitioner's representatives and Kenneth Lipper, then Deputy Mayor for Finance and Development of the City of New York, the details of which are not set forth in the record, it appears reasonable to infer that he restated the previously given reasons for the termination of petitioner's designation.

In an affidavit submitted on behalf of respondents-appellants, Mr. Lipper detailed the considerations that had led to the governmental decisions here challenged. As set forth in his affidavit, he and other City officials had become apprehensive that the need of financial service companies with corporate headquarters in the City for millions of square feet of new back office space for clerical, communication and computer operations might result in the relocation of such companies to New Jersey, Delaware and Nassau County. In connection with this concern, he set forth a judgment that had been reached that such corporations with their own real estate development capabilities would prefer an opportunity to develop and own their facilities, independent real estate developers representing to them increased costs, and depriving them of varied benefits that accompany ownership. Accordingly, City agencies had been instructed to identify large vacant areas of city-owned land that could be offered for back office development directly to user-owners. It had been determined that for brokerage firms in particular, the WSURA sites were most suitable. For these reasons it was decided that although this land had been targeted for mixed commercial and residential use through a developer, it would be in the best interests of New York City to retain the WSURA sites for owner-users seeking cleared large building sites who might otherwise consider relocating outside New York City.

On January 17, 1984, Mr. Lipper executed on behalf of the City of New York, a memorandum of agreement with Shearson/American Express, Inc. (Shearson) providing for the conveyance of site No. 1 of WSURA to Shearson, on condition that Shearson would construct a building for the exclusive, or substantially exclusive, use of Shearson or its affiliates, that would utilize a work force of approximately 900 to 1,400 employees. This memorandum of understanding further noted Shearson's intention to construct thereafter a second building which, it was contemplated, would provide for an additional 2,200 jobs.

In an affidavit by Mayor Koch dated April 4, 1984, he stated that he had adopted the policy of "sole source negotiation" for certain parcels of city-owned land to retain and create jobs within the City after extensive discussions with Deputy Mayor Lipper, Commissioner Gliedman, Stephen Spinola of the Public Development Corporation and various businessmen. Annexed to the affidavit was a press release dated March 27,

1984 announcing city-wide procedures for the sale of selected city-owned properties.

Pertinent to the issues raised in this proceeding, matters of public record although not part of the record as such, are two resolutions unanimously adopted by the Board of Estimate on June 28, 1984, after a public hearing. One resolution approved the disposition of site No. 1 to Shearson, essentially in accordance with the memorandum of agreement negotiated by Deputy Mayor Lipper.

The second resolution approved a sixth amended plan for WSURA which, as here pertinent, authorized the development of site No. 5C for commercial purposes, and assigned responsibility for review and approval of redevelopers' site plans, outline specifications and the like for sites Nos. 1, 5B and 5C to the Public Development Corporation, an agency which reported to Deputy Mayor Lipper, and which had been associated with him in the policy change that had led to the de-designation of petitioner.

The factual background was detailed in an opinion of Justice Stecher, written in a lawsuit challenging these actions of the Board of Estimate. (See, Tribeca Community Assn. v Board of Estimate, NYLJ, Nov. 14, 1984, p 5, col 3.) As set forth in that opinion, in late 1983 various agencies in the City, in contemplation of the sixth amendment, commenced studies leading to the preparation of an environmental impact statement. On February 9, 1984, the concerned agencies issued a notice of completion of the draft statement, and on February 10, 1984 the City Planning Commission certified the Uniform Land Use Review Procedure as completed. Following a public hearing on April 5, 1984, the City Planning Commission approved the proposed sixth amendment subject to several conditions, one placing the school in site No. 5C, as opposed to site No. 1, as originally planned, and another directing a site improvement of some 23,000 square feet to be designed and constructed by Shearson. It was in the form approved by the City Planning Commission that the Board of Estimate unanimously approved the sixth amendment and approved conveyance of site No. 1 to Shearson.

The termination of petitioner's designation gave rise to two lawsuits, the article 78 proceeding with which we are presently concerned and an action against the City for alleged breach of contract based on essentially the same allegations that are set forth in the article 78 petition. Prior to the

Special Term decision here appealed from, a motion to dismiss for legal insufficiency the action seeking damages for breach of contract was denied, a ruling that Special Term found controlling on it as a court of coordinate jurisdiction.

Subsequent to Special Term's decision in the instant case, this court affirmed the order denying the motion to dismiss the contract action for legal insufficiency *(Goodstein Constr. Corp. v City of New York,* 111 AD2d 49). In essence, a majority of the court concluded (p 52) that the designation agreements "implied obligations of good faith, cooperation and fair dealing implicit in any contract", and that the allegations of the complaint adequately alleged a violation of these obligations.

Preliminarily, it is important to distinguish clearly between the issues presented to this court in the contract action and those presented in this article 78 proceeding. Contrary to Special Term's view, the issues are separate and distinct.

The principle is well established, and has been often reaffirmed, that violation by a governmental official or agency of a contractual obligation gives rise to a plenary action for violation of the contract, and not to an article 78 proceeding seeking nullification of the governmental decision. *(See, e.g., Matter of Cromwell Towers Redevelopment Co. v Yonkers,* 41 NY2d 1, 5; *Matter of Oshinsky v Nicholson,* 55 AD2d 619; *Matter of Corbeau Constr. Corp. v Board of Educ.,* 32 AD2d 958.)* The reason for this distinction is inherent in the very different nature of the issues presented in a contract action and in an article 78 proceeding. In the usual situation, a claim that a public official or governmental unit has violated a contract will be adjudicated in accordance with traditional rules of contract law. As here pertinent, a claim for article 78 relief necessarily rests upon the quite separate issue as to whether the challenged determination "was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion". (CPLR 7803 [3].) The standard for deciding a claim that a governmental action was arbitrary or capricious is "whether there is a rational basis" for the challenged action. *(Matter of Colton v Berman,* 21 NY2d 322, 329; *see also, Matter of Pell v Board of Educ.,* 34 NY2d 222, 231.)*

No doubt there are circumstances in which the same governmental action may constitute a violation of contract and also be of a character that would support a claim for article 78 relief. It clearly does not follow that a contractual violation

by a governmental agency or official without more gives rise to such a claim. This contention, central to much of petitioner's argument, in effect asserts that every governmental violation of a contract entitles the other party to specific performance, a manifestly untenable proposition and one that is contrary to the uniform body of authority in this area.

Similarly, it is clear that the issue of good faith presented in a contract action is distinct from the issue of good faith when it is sought to be raised in an article 78 proceeding. In its previous decision in the contract action, this court, relying primarily on *Rochester Park v City of Rochester* (38 Misc 2d 714, *affd* 19 AD2d 776) a contract action, and giving to the complaint the benefit of the favorable construction appropriate on a motion to dismiss, concluded that the complaint was legally sufficient to assert a violation by the city of implied obligations of good faith, cooperation and fair dealing. This court did not say, and the issue was not presented, that the governmental officials concerned in this matter did not act in accordance with an honest judgment as to that which would best serve the interests of the city, the only relevant issue in a challenge to the good faith of a governmental decision in an article 78 proceeding.

Turning directly to the issues here presented, the record discloses no factual basis for the claim that it was arbitrary or capricious for the government officials concerned to determine that the best interests of the City would be served by reserving the remaining city-owned vacant sites in WSURA to meet the back office needs of financial concerns in the downtown area, and that direct negotiations with potential owner-users was the preferable method for conveying the sites for such purposes. Indeed, it is difficult to discern in this record anything approaching a serious claim by the petitioners that there was not a rational basis for these governmental judgments, the essential principles of which were thereafter unanimously approved by the Board of Estimate, in part, directly and in part, implicitly. As was observed by the Court of Appeals in *Matter of Abrams v New York City Tr. Auth.* (39 NY2d 990, 992), in language peculiarly appropriate to the issues here raised: "Here questions of judgment, discretion, allocation of resources and priorities inappropriate for resolution in the judicial arena are lodged in a network of executive officials, administrative agencies and local legislative bodies."

Also untenable is petitioner's claim that the revocation of petitioner's designation violated lawful procedure or was af-

fected by an error of law. The power to revoke the designation of a developer of an urban renewal project was squarely sustained by the Court of Appeals in *Matter of Armere Holding Corp. v Bell* (37 NY2d 925, 926). The Court of Appeals went on to say, in *Matter of Armere,* that the tentatively designated developer may not be subject to arbitrary action and is "entitled to the 'assurance, implemented by the right to a hearing which need consist of no more than an opportunity to deny or explain, that the [commissioner] has not acted arbitrarily or capriciously' " (at p 927). The record is clear that petitioner participated in two such hearings.

Similarly unpersuasive is petitioner's claim that the decision to use "sole source negotiations" in disposing of the remaining vacant sites violated New York City Charter § 1105 (b) which requires that an opportunity be provided to interested persons to comment in writing before any rule or regulation may be adopted. Nothing in the record supports the notion that the varied and changing policies of HPD with regard to the disposition of vacant sites in urban renewal areas are rules and regulations of the kind contemplated in the City Charter section. The tenuous character of this claim is underlined by a statement by Charles Reiss, Deputy Commissioner of HPD, in an affidavit submitted in a prior litigation relating to the sites in question, an affidavit here submitted by petitioner. In that affidavit, dated October 8, 1982, presented in a lawsuit in which petitioner and HPD were joined together against a prior developer of the sites in question, Mr. Reiss said: "Whereas prior policy allowed entities * * * to become tentative sponsors and developers of urban renewal projects without the City's having the benefit of other proposals, present policy favors (although it does not absolutely require) open competition through a request for proposal process."

Turning finally to petitioner's challenge to the good faith of the governmental decision to revoke its designation, it becomes immediately apparent from a study of petitioner's papers that most of the allegations relied on are not addressed to the issue of good faith as we understand it to apply here, which, simply stated, is whether the challenged determination represented an honest judgment reached by the responsible public officials in what they believed to be the best interests of the City.

The only part of petitioner's good-faith argument that has any discernible relevance to the issue of good faith as we have

defined it rests upon the claim that in his capacity as finance chairman for Mayor Koch's gubernatorial campaign, and prior to his appointment as Deputy Mayor, Mr. Lipper successfully solicited contributions, the amount not being specified, from persons associated with Shearson. Petitioner's contention appears to be that it was de-designated as developer of sites Nos. 5B and 5C because Mr. Lipper was motivated in his recommendations and actions with regard to the City sites in question by a desire to confer a benefit on a firm whose principals had contributed to the Koch campaign. We are unable to find in petitioner's papers a factual showing sufficient to give rise to a triable issue on this claim.

In substance, petitioner seeks a trial in which the fact finder would be required to make a speculative psychological judgment as to whether a participant in a governmental decision was influenced by a desire to discharge a personal obligation to a firm whose principals had contributed to a campaign whose fund raising efforts he headed, in recommending policies that a responsible public official in his position could reasonably have recommended on the merits, policies that were adopted by the administration in which he was an important official, and the essential principles of which were approved, after a public hearing, by the City Planning Commission, a body with special experience and competence in land use matters, and ultimately by the Board of Estimate. Our attention has been invited to no decision in which so nebulous an issue affecting the good faith of a governmental decision was found to justify a trial.

*Mulligan v Lackey* (33 AD2d 991) the principal authority relied upon by petitioner in this aspect of its argument, is clearly distinguishable. In *Mulligan,* a construction project contract had been annulled after it was ascertained that a member of the agency awarding the contract was an employee of the company to which the contract was awarded. Within a month after the contract was nullified, and after the agency member who had the conflict of interest resigned from it, the agency again awarded the contract to the same company. The conclusion of the court in *Mulligan* (at p 992) that under the circumstances "the purposes of the conflicts of interest statute will best be served by * * * relegating the parties to a trial of the issues forthwith" does not seem to us persuasive authority with regard to the issue here posed.

The tenuous character of the issue pressed by petitioner, and its inadequacy to give rise to a triable issue is underlined

by three circumstances clearly established in the record, circumstances in large part presented in newspaper articles introduced by the petitioner as exhibits.

In one such newspaper article proffered by petitioner, apparently in part because it includes confirmation that Mr. Lipper had solicited funds from Shearson for the Koch gubernatorial campaign, the writer also reports, without any denial or disclaimer by petitioner, that one of petitioner's principals had made a substantial contribution to the same campaign, and goes on to characterize a senior partner in the law firm that represented petitioner during the relevant period of time as "the Mayor's chief real estate fundraiser."

Second, in another newspaper article appended as an exhibit to petitioner's papers, it is reported that during the summer of 1983, months before the Deputy Mayor had any discussions with Shearson with regard to any site in WSURA, he and the Public Development Corporation had participated in negotiations with Merrill Lynch & Company with regard to the possible conveyance of sites Nos. 5B and 5C to that company. The article was apparently introduced by petitioner in support of the claim that there had been a violation of its claimed contractual right to exclusively negotiate with HPD for the development of sites Nos. 5B and 5C. Whatever the relevance of the Merrill Lynch negotiations may be to petitioner's contract action, the article introduced by petitioner clearly establishes that the Deputy Mayor had formed his judgment as to how the vacant sites in WSURA should be developed, and the appropriate method for negotiating the development of those sites, at a time when the motivation speculatively attributed to him could not possibly have affected that judgment.

Finally, petitioner's papers wholly fail to disclose any connection between Deputy Mayor Lipper's supposed improper motivation to be of assistance to Shearson and petitioner's de-designation as developer of sites Nos. 5B and 5C. The Deputy Mayor's negotiations with Shearson, which had commenced in the fall of 1983 after he had learned that Shearson was considering space in New Jersey for its back office operations, resulted in a memorandum of agreement to convey site No. 1 to Shearson. Nothing in that memorandum of agreement would have been inconsistent with petitioner's continuance as developer of sites Nos. 5B and 5C.

For the reasons set forth above, we are unable to discern in

this record any factual allegations requiring a trial as to whether the determination to de-designate petitioner as a developer of sites Nos. 5B and 5C was arbitrary and capricious, was reached in bad faith and for improper purposes, or was affected by an error of law or defect in procedure. Accordingly, the order of the Supreme Court, New York County (Stanley S. Ostrau, J.), entered January 4, 1985, granting the petition in this article 78 proceeding to the extent of directing a trial as to whether a determination of HPD de-designating petitioner as developer of sites Nos. 5B and 5C was arbitrary and capricious, and as to whether it represented a good-faith judgment, should be reversed, on the law, without costs, to strike the direction for a trial and dismiss the petition.

FEIN, J. (concurring). I concur that there is no basis for a trial and that the petition should be dismissed. This court has previously held, in an action brought by these petitioners against the City for breach of contract on the basis of essentially the same allegations as set forth in this CPLR article 78 proceeding, that a cause of action for damages was stated in that complaint, and that a motion to dismiss for legal insufficiency was properly denied (*Goodstein Constr. Corp. v City of New York,* 111 AD2d 49). It was there concluded (p 51): "The designation agreements obligated both parties to cooperate and exert their best effort in the creation and negotiation of a plan for the development of the sites. Clearly, the letter agreements by their nature did impose a covenant of fair dealing and good faith, an obligation implicit in all contracts." It was held that the complaint adequately alleged a violation of these obligations, compensable by damages.

Thus, the only difference between that action and this article 78 proceeding is the relief sought. In reality petitioners here seek specific performance, albeit their proceeding is on its face brought under article 78 to overturn the de-designating determination as arbitrary, capricious and made in bad faith. The real objective of this proceeding, as petitioners concede, is to compel re-designation. They have conceded that if an article 78 proceeding is deemed inappropriate for the purpose they seek to achieve, the proceeding should be converted into an action for specific performance.

It is well settled that an article 78 proceeding may be converted into whatever form is proper to grant requisite relief if an appropriate case is made (CPLR 103 [c]; *Matter of Phalen v Theatrical Protective Union No. 1,* 22 NY2d 34, *cert*

*denied* 393 US 1000; *Matter of Oshinsky v Nicholson,* 55 AD2d 619; *Ammex Warehouse Co. v Procaccino,* 85 Misc 2d 327, *affd* 55 AD2d 535). However, no such basis may here be found.

It is plain enough on this record that the appropriate City agencies have made a determination that the site areas involved are to be utilized for commercial enterprises plus a school, and not as contemplated at the time the petitioners were designated. It was then the intention that these sites should be utilized for combined residential and commercial purposes. Whether the court considers that such change of use is advisable or inadvisable, the court is without power to act if, as readily appears, there is a lawful basis for the determination. *(Coalition Against Lincoln W. v City of New York,* 94 AD2d 483, *affd* 60 NY2d 805; *Town of Huntington v Park Shore Country Day Camp,* 47 NY2d 61; *see, Matter of Board of Educ. v City of New York,* 41 NY2d 535; *Bacon v Miller,* 247 NY 311.)

A violation of duty by a governmental official or agency may well give rise to a plenary action for breach of the contract, but not to an article 78 proceeding seeking specific performance under guise of mandamus or certiorari *(Matter of Corbeau Constr. Corp. v Board of Educ.,* 32 AD2d 958).

Whatever the personal motives of the City officials involved, there is nothing shown to demonstrate that the decision to change the site from a mixed residential and commercial use to an all commercial use was without a rational basis and not in the best interest of the City. If there was a breach of contract and damages were sustained by petitioners, the appropriate relief is available in the damage action in which the complaint has already been held by this court to be sufficient.

Moreover, the Board of Estimate's approval of the changed use of these sites has been upheld as is plainly established in the thorough opinion of Justice Stecher with respect to the sixth amendment to the plan *(Tribeca Community Assn. v Board of Estimate,* NYLJ, Nov. 14, 1984, p 5, col 3).

Special Term, relying primarily on *Rochester Park v City of Rochester* (38 Misc 2d 714, *affd* 19 AD2d 776), a contract action, concluded that the case provided a sufficient basis for directing a trial in these proceedings. However, it is notable that although Special Term in that case sustained a complaint which alternatively sought specific performance or damages, the Appellate Division, in affirming, made no determination warranting specific performance. The Appellate Division

noted, in affirming the denial of the city's motion for summary judgment, that the limited issue was whether section 508 of the contract there in dispute required Federal Housing and Home Finance Agency (HHFA) approval, and whether the city had acted in bad faith in failing to obtain such approval and then in terminating the contract upon the ground that no such approval was forthcoming. There was no holding in that case that specific performance rather than damages was the appropriate remedy. The Appellate Division stated: "While section 508 ultimately might be found to be unambiguous, 'Even in the case of an integrated written contract, the meaning of the words may depend upon various surrounding circumstances that are in dispute; the circumstances must be found as a fact before interpretation can proceed.' (3 Corbin, Contracts, § 554, p. 223.) *We pass on no other questions.*" (19 AD2d 776, *supra;* emphasis supplied.)

It is plain enough that *Rochester Park (supra)* is not authority for concluding that specific performance could be granted against the city. Indeed, the grant of specific performance would, in effect, direct the city to undo that which has been accomplished by adopting the sixth amendment to the plan *(Tribeca Community Assn. v Board of Estimate, supra).*

The cases relied upon in the dissent do not speak to this issue. Thus, in *Paese v Pilla* (59 AD2d 701, *mot to dismiss appeal granted* 43 NY2d 835), the issue was whether the petitioner who was discharged as village engineer was entitled to a hearing as to whether his discharge had been made in good faith under guise of abolishing his civil service position. It is one thing to direct a hearing to determine whether the individual's employment in a civil service position was terminated in bad faith, in violation of the Civil Service Law. It is quite another to direct a hearing to determine whether the Board of Estimate and the City Planning Commission had a rational basis for approving the change of the land use plan here involved.

Equally untenable as a basis for directing a trial is *Mulligan v Lackey* (33 AD2d 991). In that case the article 78 proceeding was brought to set aside the award of a construction project contract to a construction company, one of whose employees was a member of the governmental agency which authorized the contract. A prior contract awarding the project to the same company had been held void by reason of a conflict of interest. The employee then resigned from the agency, which then authorized readvertising. The petitioner

and the former agency member's company submitted bids and the contract was again awarded to the employee's company. The court held that a square issue of conflict of interest pursuant to General Municipal Law § 801 was raised, and that a trial should be held upon that narrow issue. Thus, the sole issue tendered was whether the construction company which obtained the contract was barred because its employee had helped to draw the specifications for the contract as a member of the governmental agency. Again, this has nothing to do with whether the land use change here authorized was rational.

I have no quarrel with the holding in that case that even in an article 78 proceeding disputed issues of fact require a trial. *Matter of Armere Holding Corp. v Bell* (37 NY2d 925) is not to the contrary. That case holds only that a de-designated developer is entitled to an explanation of the reason at a hearing before the commissioner involved. It is not authority for the proposition that the de-designated developer is entitled to a judicial trial where the remedy sought is specific performance. Nor is it within the purview of the court to determine whether the change of land use policy is warranted. It is not the function of the court to substitute its judgment for that of the agency reviewed, if agency action can be supported on any reasonable basis *(see, Matter of Eastway Constr. Corp. v Gliedman,* 86 AD2d 575; *Matter of Kayfield Constr. Corp. v Morris,* 15 AD2d 373).

It is plain that the procedures required to re-designate the petitioner would run the full panoply of government action prescribed by the Uniform Land Use Review Procedure (ULURP), New York City Charter § 197-c.

The procedure required and not yet undertaken pursuant to ULURP would entail a series of public hearings before the Local Community Board, the City Planning Commission and the Board of Estimate after an environmental impact statement has been prepared. At the time of the de-designation of petitioner, ULURP had not even begun. Indeed, petitioners concede that at best they merely had the authority to "exclusively negotiate" with respondents. How such negotiations could proceed in face of a change in land use policy does not appear. The right of the public agencies to change land use policy in the perceived public interest is clear. Hence, if petitioners were to succeed, the entire process would have to be followed without any determination that there was lacking a rational basis for the change in policy.

There is no right to specific performance to change such policy determination *(Orelli v Ambro,* 41 NY2d 952; *Citizens Committee for Faraday Wood v Lindsay,* 507 F2d 1065, *cert denied* 421 US 948). Although we need not go so far, it is noted that in *Faraday Wood,* the court observed (at p 1072): "It seems to us that it is a proper exercise of discretion for HDA to terminate a project when it feels that the Board of Estimate is unlikely to approve it because of public protest and political considerations."

Neither an article 78 proceeding by way of mandamus or certiorari to review, nor an action for specific performance, is warranted on this record. Whatever remedies are available are encompassed in the companion contract action for damages.

ELLERIN, J. (dissenting). The issue before us in this CPLR article 78 proceeding is whether the allegations of wrongdoing in the record are sufficient to warrant the holding of a hearing, as directed by Special Term, to determine whether or not appellants, the City of New York and the Commissioner of the New York City Department of Housing Preservation and Development, acted in good faith when they summarily de-designated the petitioner as the developer of sites Nos. 5B and 5C of the Washington Street Urban Renewal Area on November 29, 1983. It is acknowledged that at the time of the de-designation petitioner had fully performed and discharged all of the obligations it had assumed under its agreements with appellants, including expenditures in excess of $800,000, and that appellants concededly had found no fault in any respect with petitioner's performance. While appellants assert that the de-designation of petitioner was due to a "new policy" providing for "sole source" negotiations—that is, privately negotiating with individual potential owner-users of public property in distinction to the sale of such property by way of public bidding—announcement of the adoption of that new policy was first made on March 27, 1984, some four months after the de-designation here in issue.

A brief chronological recitation of the facts is helpful in placing the relevant issues in proper perspective.

In March 1981, the Department of Housing Preservation and Development (HPD), the municipal agency charged under the New York City Charter with sole responsibility for urban renewal planning and land disposition, issued a formal request for proposals (RFP) soliciting offers from those interested in

formulating a plan for the redevelopment of site No. 5C of the Washington Street Urban Renewal Area (WSURA). The petitioner, a joint venture consisting of Goodstein Construction Corp., Dic-Underhill Industries and Milstein Properties (Goodstein) submitted a proposal which, consistent with the RFP, included provision for the development of a partially subsidized residential apartment building, for 30,000 square feet to be devoted to commercial use and associated parking, and for the continued operation and maintenance of the city-owned Washington Market Park. Petitioner's proposal, and one other, were subsequently reported to be the "most appropriate and complementary to the community" by the Chairman of the Washington Street Committee of Manhattan Community Board No. 1.

In August 1981, HPD, in conjunction with the New York City Public Development Corp., made a similar request for proposals for the development of site No. 5B of the WSURA. Petitioner's submission with respect to that site proposed the construction of 1.1 million square feet of office space with associated retail space and parking and also included the required provisions for development of a public plaza and the grant of a perpetual easement to the College of Insurance.

After review of the various submissions in response to the RFPs, HPD informed petitioner that it had been selected to exclusively negotiate with the City for the terms of disposition for both sites Nos. 5B and 5C. This was done by way of letter agreements from HPD to petitioner, dated January 29, 1982 with respect to site No. 5B and February 1, 1982 with respect to No. 5C. Each letter agreement stated that petitioner was selected to exclusively negotiate with the City for 90 days, commencing on February 8, 1982, for development of the specified site and further provided that if a plan for development had not fully been agreed upon at the end of the 90-day period, the City had the option to extend the exclusive negotiating period in 30-day increments. Each letter also contained a statement that the City expressly retained "the right to terminate negotiations at any time".

Extensive negotiations followed during the ensuing months culminating in new designation letter agreements, dated June 2, 1982, superseding the original agreements. The agreements provided that petitioner had been selected to exclusively negotiate the terms and conditions of a land disposition agreement (LDA) with HPD for the development of each of the sites, and delineated the obligations of the parties in extensive detail.

Petitioner's obligations included the immediate submission of two letters of credit for $100,000 each as assurance deposits; the development of architectural plans, building designs, marketing concepts and financial projections; the furnishing of progress drawings including sketches of typical floors, plaza and landscaping layouts and the like; the preparation of the necessary materials for the Uniform Land Use Review Procedure (ULURP); the filing of Department of Housing and Urban Development mortgage insurance applications, and environmental review statements (not only as to these sites but also as to other sites of the WSURA); and, the long-term maintenance at petitioners' expense of nearby Washington Market Park "for public use and access".

While petitioner was obligated under the agreements to fully and expeditiously cooperate with HPD in meeting the legal requirements necessary for approval of the land disposition agreements, HPD expressly undertook to "expeditiously complete all of its obligations in connection with the legal requirements, including the ULURP pre-certification process".

Significantly, the June 2, 1982 designating agreements eliminated the language found in the earlier January 29th and February 1st agreements that the City retained the right to terminate negotiations at any time.

During the year following these agreements it is conceded that petitioner fully and satisfactorily performed all of its obligations and that by mid-1983 the LDAs had been fully negotiated and agreed to by all parties.

With respect to site No. 5B, which was intended to further economic development within the WSURA and provide additional office space for clerical and professional jobs in lower Manhattan, petitioner in early 1983 had entered into negotiations with Shearson/American Express, Inc. (Shearson) for a 35-year lease. Those negotiations had reached a stage where detailed terms were memorialized in a letter dated May 9, 1983, sent to Shearson, at its request, by its broker. These terms provided for a building to be constructed for the exclusive use of Shearson and contemplated an equity interest for Shearson. As part of these negotiations, Goodstein undertook to attempt to obtain a tax abatement for Shearson. The City initially cooperated with Goodstein's efforts in that regard. When first approached, City representatives indicated there would be no problem with respect to a tax abatement as other sites within the WSURA had been granted these abatements.

Such assurances, however, proved short-lived and petitioner asserts that it is at this juncture that the actions of the City took on a different character. It is claimed that then Deputy Mayor Kenneth Lipper, who had assumed that position in early 1983 and was fully aware of petitioner's negotiations with Shearson for a building to be used for back office jobs, improperly interjected himself into the situation by directing that no tax abatements be granted to petitioner's sites although other buildings in the area had been granted or promised such abatements and that the denial of such tax abatement frustrated finalization of the proposed "deal" between Shearson and petitioner. It is not denied that shortly thereafter, in the summer and fall of 1983, Lipper himself entered into negotiations with Shearson which ultimately resulted in an agreement between the City and Shearson whereby Shearson was to purchase other WSURA sites, located but two blocks away from petitioner's site, and was to receive extremely generous tax abatements and other incentives. Allegations are made that the very favorable treatment extended to Shearson was not unrelated to campaign contributions which it made in response to Mr. Lipper's political fund raising efforts during the 1982 gubernatorial campaign. Similar assertions of personal interest coloration are made with respect to Mr. Lipper's negotiations with other large financial institutions for office space during this period.

It is further contended that Mr. Lipper's intrusion into the situation during the summer of 1983, and thereafter, was the real reason for HPD's subsequent refusal to fulfill its express obligation to take all necessary steps, including those relating to ULURP precertification, to administratively process for approval the plans which had been jointly developed by the parties during the preceding year.

HPD informed petitioner that its designation was terminated by letter, dated November 29, 1983. The official reason given for the de-designation in that letter was as follows: "This action is being taken because of the city's interest in retaining and attracting back office jobs in New York City. Given the difficulty and time needed to assemble large parcels in Manhattan, the City has decided it is in the best interest of the City to reserve the Washington Market Urban Renewal Sites 1, 5B and 5C for commercial development by back office users, many of whom wish to construct their own buildings."

At petitioner's subsequent meeting with HPD Deputy Commissioner Reiss, he acknowledged that petitioner had always

been in good standing and that no fault was to be found in any respect with its performance, that the LDAs had been fully negotiated prior to de-designation, and that there was clear support in the Community Board and the Washington Market community at large for petitioner's development plans.

On January 17, 1984, a memorandum of agreement was executed by Mr. Lipper on behalf of the City with Shearson providing for the conveyance of sites Nos. 1A and 1B of the WSURA.

The instant article 78 proceeding was commenced on January 30, 1984, Goodstein contending that the City arbitrarily and capriciously terminated its designation due to the improper actions of then Deputy Mayor Lipper and that the stated reason of the change in land use policy was without basis in fact.

The City generally denies allegations of wrongdoing and asserts that the de-designation was the result of a lawful change in City policy regarding land use of WSURA. In support of its position the City submitted the affidavit of former Deputy Mayor Lipper, dated March 21, 1985, which describes the change in policy which is asserted to be the reason for petitioner's de-designation and the desirability of pursuing that policy of "sole source" or direct negotiations with large firms for back office space rather than dealing through developers such as petitioner. While reference is made to "studies done by consultants", the specific "studies" themselves were not included. An affidavit by the Mayor was also submitted indicating that the City's policy for "sole source negotiations" with private firms was formally announced by him on March 27, 1984.

Since petitioner was formally de-designated on November 29, 1983, it understandably asserts that the City's change of policy to "sole source" negotiations, first adopted some four months later, is but a *post hoc* attempt to justify its wrongful termination of petitioner's designation. In support of this position, attention is directed to the fact that petitioner's negotiations with Shearson were designed to promote the retention of the back office type of jobs that are allegedly the *raison d'etre* of the new "sole source" negotiations policy and that had petitioner's negotiations not been wrongfully interfered with, retention of those jobs would have been accomplished on terms more favorable to the City than was ultimately the case.

Special Term concluded that the allegations of the petition were sufficient to raise questions of fact requiring a hearing. I agree.

In this article 78 proceeding, the issue is whether the de-designation of Goodstein was arbitrary and capricious or without rational basis. "The arbitrary and capricious test chiefly 'relates to whether a particular action should have been taken or is justified * * * and whether the administrative action is without foundation in fact.' (1 N.Y. Jur., Administrative Law, § 184, p. 609)." *(Matter of Pell v Board of Educ.,* 34 NY2d 222, 231; *see also,* 5 NY Jur 2d, Article 78 and Related Proceedings, § 32.)* Significantly, governmental action which is not taken in good faith can be vitiated and a full hearing is the appropriate avenue for the making of such determination. *(Paese v Pilla,* 59 AD2d 701.)

Justice Sandler's analysis and evaluation of the allegations and issues raised herein are perhaps the most persuasive demonstration of the need for a hearing. A summary determination is made that the possibility that a public official might be influenced by a desire to discharge a personal obligation to a firm, whose principals had contributed to a campaign whose fund raising efforts he headed, in recommending policies to the City Planning Commission and Board of Estimate is too "nebulous an issue affecting the good faith of a governmental decision to justify a trial". I find this conclusion as untenable as are the City's repeated conclusory assertions that since the new policy of "sole source" negotiations is one in the "best interests of the City", any allegations as to the motivation of self-interest of the then Deputy Mayor are irrelevant.

The City attempts to buttress its position by arguing that "[e]ven if petitioner's allegations against the Deputy Mayor were correct, they are of no moment, because * * * the process of government overcame the acts of one individual". In essence it asserts that since the City Planning Commission and the Board of Estimate some months later approved the City-Shearson agreement, the Deputy Mayor, as only a single "cog" in a larger wheel, could not have improperly influenced or "controlled" the governmental process. Completely ignored is the fact that the particular governmental official happened to be the Deputy Mayor who, by his own acknowledgement, was in charge of "supervising New York City's budget and tax departments", and was "responsible for the City's Office of Economic Development and Public Development Corporation", agencies which "establish government policy concerning busi-

ness, industry, commerce and real estate, which affect the City's economic well being", all of which would certainly place his actions, and motivation, in a category far different from that of an ordinary functionary.

While it is true that the City Planning Commission and the Board of Estimate are the final arbiters of a particular policy, they are entitled to have those decisions made on the basis of objectively submitted information and recommendations made by public officials solely on the merits and not colored by any conflicts of interest or personal considerations. Any recommendation can be cloaked with a patina of "best interests of the City" or other appropriate rhetoric. Neither the public interest nor the City's best interests can, however, be said to be advanced when such recommendation, even in part, is predicated upon self-serving considerations which will result in the according of favored treatment. Instructive in that regard are the purposes of the laws requiring competitive bidding in the letting of public contracts which are " 'to guard against favoritism, improvidence, extravagance, fraud and corruption' ". *(Matter of Conduit & Found. Corp. v Metropolitan Transp. Auth.,* 66 NY2d 144, 148; *see, Orelli v Ambro,* 41 NY2d 952.)

The intrusion of personal interest considerations into governmental activity is, of course, rarely overt or publicly acknowledged. As a rule, it lies silent and invidious unless unearthed by the glare of adversarial scrutiny, precisely the format of a full hearing.

Notwithstanding that the majority does not find the decision in *Mulligan v Lackey* (33 AD2d 991) "persuasive authority", the holding there is particularly relevant to the instant case. While the facts as to the alleged conflict of interest in *Mulligan* are somewhat different than those here asserted, in each case it is allegations of wrongful conduct that serve as the underlying predicate for the article 78 proceeding to set aside specific governmental action. In that case, as here, affidavits were submitted, on the one hand alleging that the award was tainted by conflict of interest and, on the other contradicting some of the allegations of the petition. The court very aptly noted that: *"Disputed factual issues should not be resolved upon affidavits* (see *Matter of Carucci v. Dulan,* 24 A D 2d 529). If a triable issue of fact is raised in an article 78 proceeding, it shall be tried forthwith (CPLR 7804, subd. [h])" *(id.,* p 991; emphasis added).

The allegations made by petitioner are very serious ones and would directly impact on the issue of whether the City acted here in good faith. It may well be that there is no merit whatsoever to the petitioner's assertions and allegations, and, indeed, the former Deputy Mayor is a person whose talents and abilities are widely held in high esteem. If that is the case, a full hearing will certainly demonstrate the lack of merit to such charges of bad faith and it is difficult to understand why the City is so resistant to going forward with a proceeding which would vindicate its position. *(Cf. Paese v Pilla,* 78 AD2d 677, *affd* 54 NY2d 675.) Alternatively, if a hearing discloses that the decisions in issue were motivated or tainted by some improper considerations, then clearly petitioner and all other interested parties including the appropriate governmental bodies, are entitled to know that such is the case.

While the function of our courts in reviewing the propriety of a particular governmental action in an article 78 proceeding is limited, and requires that the greatest of deference be extended to the judgment and discretion exercised by executive officials, that deference necessarily presupposes that such judgment and discretion have been lawfully exercised with the utmost honesty and in good faith. The majority appears to indicate that, once some showing of a rational basis for the executive judgment has been made, allegations impugning the good-faith nature of that showing can be summarily disposed of or relegated to the companion contract action. It may be noted that whatever its present posture, the defendant City itself, in that contract action, acknowledged that the instant action is the proper vehicle for addressing the issue as to whether the City acted in bad faith. *(See,* record on appeal, *Goodstein Constr. Corp. v City of New York,* appeal No. 22803, at 252, 253 [111 AD2d 49].) To ignore the serious allegations of "tainted judgment" and bad faith raised here, particularly in light of the sequence of events, would be to render meaningless the function of an article 78 proceeding as a safeguard against the unjustifiable excesses in the exercise of the awesome power of the executive.

Accordingly, I would affirm the order of the Supreme Court, New York County (Stanley S. Ostrau, J.), directing a trial on the issue of whether the determination de-designating petitioner was made in good faith.

Sandler, J. P., concurs in an opinion in which Ross, J., concurs; Fein, J., concurs in a separate opinion in which Ross,

J., concurs; ELLERIN, J., dissents in an opinion in which KASSAL, J., concurs.

Interlocutory order, Supreme Court, New York County, entered on January 4, 1985, reversed, on the law, without costs and without disbursements, to strike the direction for a trial and dismiss the petition.