Breitel, J.
Landlord, Samuel Greenberg & Co., appeals from an order of the Appellate Division, First Department, in a consolidated proceeding, annulling determinations by the Rent Administrator and remanding the matters to the Rent Administrator for reconsideration. In one of the proceedings tenants had sought to annul a rent increase granted landlord on the basis of a recent purchase price for a residential apartment building. In the other (involving the same building) landlord had sought to annul a directive based on landlord’s alleged failure to maintain essential services. The Administrator directed that it install an intercommunication system and deferred the rent increase until landlord had contracted for such installation.. The proceedings are interrelated because the City Rent and Rehabilitation Law conditions rent increases and other kinds of relief allowed to a landlord on the fact and certification *328 by the landlord of the maintenance of essential services. In the rent increase proceeding landlord had prevailed before the Administrator and Special Term. In the essential services proceeding the Administrator, and therefore the tenants, prevailed at Special Term. The Appellate Division, in reversing both judgments and annulling the administrative determinations, did so by a divided court (27 A D 2d 928, Per Curiam, two Justices dissenting in an opinion). The Administrator, although only a respondent, supports landlord’s position in this court as to result, but disagrees as to some of the grounds urged by landlord.
Although landlord presses its appeal from the essential services aspect of the Appellate Division order, it has abandoned its contentions before that court with respect to the requirement for installation of an intercommunication system and the deferred dating of the rent increase order to enforce the installation and maintenance of certain lobby protection. The strategy is designed to avoid delay by the remand on that issue and the prosecution of a relatively insignificant factual dispute before the Administrator. Instead, it is now ready to abide by the Administrator’s determination from which it had appealed to the Appellate Division. This is not an illogical position because, while landlord succeeded in upsetting the administrative order, it did not obtain the peremptory relief it had sought. Tenants still urge that landlord is not entitled to any increase because essential services were not maintained and resist the Administrator’s determination granting a rent increase, however conditional.
The principal issue is whether landlord, who contracted to purchase the property in December, 1961 and took title in 1962, may obtain a rent increase based upon net return at the adjusted purchase price for the property of $1,009,000. Tenants dispute the acceptance of the purchase price on the ground that it was not arranged on normal financing. The seller agreed to subordinate the purchase-money mortgage to a prospective refinancing of the nine-year-old, and almost expired, first mortgage up to the amount of $400,000, which was used in part to reduce the purchase-money mortgage. Tenants argue that by this device landlord had not paid as much as 20% of the purchase price in cash, although the seller received much more than that, *329 namely, 24.75% on the initial transaction and 33⅓% if the results of the refinancing are included. The corollary issue in the essential services proceeding and underlying the allowance of the rent increase is whether landlord and its predecessors maintained full lobby protection 24 hours a day after the conversion in 1949 to automatic operation of the manual elevators in the building.
While both sides argue whether there was substantial evidence to support the Administrator’s determinations, the proper test is whether there is a rational basis for the administrative orders, the review not being of determinations made after quasi-judicial hearings required by statute or law. True, the Administrative Code requires the agency to “ accord a reasonable opportunity to be heard * * * to the tenant and the landlord ”, but it does not require that an evidentiary hearing precede the valuation determination. Under CPLR 7803 (subd. 4) the substantial evidence test applies only where a hearing has been held and evidence taken “ pursuant to direction by law ”. Thus, under both the Administrative Code and the CPLR, review is limited to establishing whether the determination was “in accordance with law * * * arbitrary or capricious ” (Administrative Code of City of New York, § Y51-5.0, subd. g, par. [6]; § Y51-9.0, subd. b; see CPLR 7803, subd. 3; Matter of Fink v. Cole, 1 N Y 2d 48, 52-53; Matter of Going v. Kennedy, 5 A D 2d 173, 176, affd. 5 N Y 2d 900; Chung Tiam Fook v. Herman, 212 N. Y. S. 2d 939, 941 [Sup. Ct., Kings County, 1961] ; 1 N. Y. Jur., Administrative Law, § 178, pp. 594-595).
On any view, however, landlord properly argues that the scope of review involves only questions of law and that the Appellate Division was without power to reverse on the facts, as it did (e.g., Matter of Humphrey v. State Ins. Fund, 298 N. Y. 327, 332). Significantly, in this case, the Appellate Division reversed on the law and the facts. The majority said, moreover, that ‘ ‘ The determination herein is devoid of findings which would reconcile the terms of the financing with the statutory norms and the maintenance of essential services.”
Landlord agreed in December, 1961 to purchase the property consisting of 38 apartments and 4 stores for $1,010,000 as follows:
*330 (1) Subject to first mortgage paying B%% interest, maturing July 31, 1962 ....................... $223,450.73
(2) Subject to second mortgage due November 1, 1962 ........................................ 58,712.50
(3) Purchase-money mortgage, $100,000 payable August 1, 1965, and regular amortization from February 1, 1966, and retirement in full February 1, 1968 .................................. 477,836.77
(4) Cash ..................................... 250,000.00
$1,010,000.00
In July, 1962 the first mortgage was refinanced with a savings bank in the sum of $400,000 and, by virtue of the subordination clause in the purchase-money mortgage, the new mortgage was a first lien. From the proceeds, the prior first mortgagee was paid off ($225,545.58) as was the second mortgage ($57,962.50). The balance of $116,491.92 was retained by landlord except that $50,000 of it was used to pay the seller on account of the purchase-money mortgage principal in exchange for a three-year extension of the due date on that mortgage.
The assessed valuation of the property for 1963-1964 and 1964-1965 was $610,000. At the time of the purchase it had been $525,000 and in the following year had risen to $560,000. It is conceded that the building is a luxury-type apartment residence in a select neighborhood at 145 East 74th Street in Manhattan. The rents average $35 per room, under existing controls, a rate which landlord contends is considerably lower than comparable properties under statutory rent controls. This last fact is not seriously disputed by tenants but evidently considered by them to be irrelevant.
On February 27, 1964 landlord filed its application requesting a 6% return based on the purchase price of $1,010,000 (later adjusted in a minor detail to $1,009,000). The application was filed just two years after the acquisition by landlord. The statute requires such a waiting period to deter sales solely for the purpose of obtaining increases in controlled rents (Administrative Code, § Y51-5.0, g, [1], [a], [2], [ii]). Almost a year later, on February 3, 1965, the Administrator’s Valuation Committee accepted the price of $1,009,000. Tenants, in the mean *331 time, applied for a rent reduction grounded upon the claim that landlord had permitted an intercommunication system to fall into disuse and had discontinued 24-hour lobby protection and doorman service.
On February 17 1965 an informal joint hearing was held covering both the rent increase proceeding and tenants’ application for a rent reduction based on landlord’s alleged failure to maintain essential services. After various further proceedings, administrative orders were issued sustaining landlord’s application and granting tenants’ application to the extent of conditioning the certification of essential services on installation of an intercommunication system and the resumption of part-time doorman service from 3:00 p.m. to 4:00 p.m. and from 5:00 p.m. to 11:00 p.m. throughout the year. Under the statute essential services must be certified to have been maintained if landlord is to receive a rent increase of any character (Administrative Code, § Y51-Y5.0, g, [5], [b]).
Before the administrative agency at the district level, on protest proceedings, and before the courts, tenants have urged that the assessed valuation should remain the net return base because: the purchase price was excessive (192% of the then assessed value and 170% of the current assessed value); the mortgages after refinancing exceeded the assessed value; the subordination clause in the purchase-money mortgage was irregular and abnormal; the refinancing resulted in deferred amortization of the purchase-money mortgage; the refinancing of the almost expired first mortgage raised the interest rate from 3¾% to 5½% upon a principal increased by $116,491.52; the price was 9.38 times the gross income of the property; and, primarily, the cash paid for the property was diminished by the payment of some of the new financing money to the seller, over seven months after the sale, thus reducing the cash outlay for the buyer-landlord. Tenants made some other objections, not of moment, and strenuously argue that there was no other evidence or proof of value besides the assessed value and the purchase price.
On the issue of essential services, there were contradictory versions among tenants, and present and former employees of landlord or its predecessors. The agency disagreed with the conclusions urged by both tenants and landlord. Instead, it *332 worked out, partly by agreement, the formula upon which it resolved the disputed issues of fact. In declining to find that there had been 24-hour doorman service or that it had been an essential service, it noted that tenants, during the 16 years after the 1949 elevator conversion, had never complained about any failure to maintain such services.
Turning to the principal issue, the statute provides that the assessed value shall be the base for determining rents under the 6% net return formula, except that the agency “may” use a purchase price paid in a bona fide sale since 1958, resulting from a transaction at arm’s length, on normal financing terms, at a readily ascertainable price, and unaffected by certain special circumstances categorized in the statute. The agency, in determining normal financing standards, is required to give due consideration to the following factors:
“ (a) The ratio of cash payment received by the seller to (1) the sales price of the property and (2) the annual gross income from the property;
“(b) The total amount of the outstanding mortgages which are liens against the property (including purchase money mortgages) as compared with the assessed valuation of the property;
“(c) The ratio of the sales price to the annual gross income of the property, with consideration given to the total amount of rent adjustments previously granted, exclusive of rent adjustments because of changes in dwelling space, services, furniture, furnishings or equipment, major capital improvements, or substantial rehabilitation;
“ (d) The presence of deferred amortization in purchase money mortgages, or the assignment of such mortgages at a discount;
“ (e) Any other facts and circumstances surrounding such sale which, in the judgment of such agency, may have a bearing upon the question of financing” (Administrative Code, § Y51-5.0, g, [1], [a], [1], [ii]).
This enumeration of grounds for rejecting a sales price in fixing a net return base was adopted pursuant to the recommendation of the 1961 Report of the New York State Temporary Commission to Study Rents and Rental Conditions (N. Y. Legis. Doc., 1961, No. 23, pp. 18-19). The criteria had been developed *333 by the Temporary State Housing Rent Commission to prevent possible abuses under the State rent control statute which, between 1957 and 1962, required the agency to use a bona fide sales price (ibid.; see L. 1957, ch. 755). Prior to 1957, the State control statute, like the current Administrative Code provision, provided that the commission ‘ ‘ may ’ ’ use a bona fide sales price in place of assessed value (L. 1951, ch. 443). Thus, the effect of the 1961 change was to restore some measure of administrative discretion in choosing between assessed valuation and sale price, as well as to permit the agency to rely upon any of the specified criteria in rejecting sale price as an indicator of value, or rather as an acceptable net return base (see Report of the Committee on General Welfare, reprinted in Rasch, 1967 Rent Control-Laws and Regulations, p. 322; 1961 Commission Report, pp. 18-19, supra).
Tenants and landlord, from their various .stances, seek to establish either a virtually uncontrolled discretion or a virtually unvarying mandate on the agency. The case history and the legislative history of these statutory changes make clear that the legislative purpose was to do neither but to strike a middle course. The statute was designed to prevent the agency from exercising an uncontrolled discretion and yet avoid a mandate which would permit landlords to manipulate sales to provide a higher rent base nominally satisfying the several standards. (See 1961 Commission Report, pp. 17-18, supra; cf. Matter of Bajart Mgt. v. Weaver, 8 A D 2d 56, 58-59.)
The statute, as was true of its predecessors, does not require an evidentiary or quasi-judicial hearing. Indeed, the avowed purpose of the successive rent control statutes has always been to avoid protracted valuation proceedings of the kind associated with utility regulation, especially in the light of the millions of rental units to be regulated and the burden such proceedings would place on landlords and tenants of small or low-rent properties (1961 Commission Report, pp. 18-19, supra; see Matter of Kaufmann v. Abrams, 141 N. Y. S. 2d 716, 719 [Sup. Ct., N. Y. County, Hecht, J.], affd. 286 App. Div. 998, mot. for lv. to app. den. 309 N. Y. 1034; Matter of Hillwood Estates v. Herman, 33 Misc 2d 893, 895). The draftsmen of the statute, conscious of the nature of the proceeding, defined the scope of judicial review to be limited to questions of law and whether *334 the action of the agency has been arbitrary or capricious (Administrative Code, § Y51-9.0, subd. [b]). Consequently, the statutory scheme would be frustrated if other and independent proof of value were to be required, as tenants have argued should be the case. For the same reason, the requirement of findings, a procedure associated with review in the nature of certiorari of determinations by quasi-judicial tribunals, is inappropriate (Matter of Barry v. O’Connell, 303 N. Y. 46, concurring opn. by Fuld, J., at p. 53, dis. opn. by Desmond, J., p. 54, at p. 58; cf. Matter of Fink v. Cole, 1 N Y 2d 48, 53, supra; Matter of Hub Wine & Liq. v. State Liq. Auth., 16 N Y 2d 112, 119; Matter of Punnett v. Evans, 26 A D 2d 396; see, generally, 1 N. Y. Jur., Administrative Law, § 139). All that is required is that the agency’s determinations have a rational basis in the “ record ” before it and that its determinations not be arbitrary or capricious (e.g., Matter of Fink v. Cole, supra-, 1 N. Y. Jur., Administrative Law, § 178, pp. 594-595).
Apart from these procedural aspects of the applicable statute there are some general substantive principles that should be stated before considering further the precise issues raised. As the Administrator argues, somewhat to the contrary of landlord, no one of the factors which the statute states “ shall ” be considered in determining what is normal financing is controlling, even if compliance with the particular standard is fully established. Thus, the fact of ample cash payment on purchase price is not controlling. The Administrator’s discretion is still to be influenced by the other standards even though satisfaction of one standard may mean that another is also satisfied in whole or in part (Matter of Bajart Mgt. v. Weaver, 8 A D 2d 56, 59-60, supra). The purpose in having the several and even overlapping standards is to reduce the risk of manipulation by the use of “ boot-strap ” sales, however bona fide, to obtain rent increases. Moreover, the catchall standard (the last specified in the statute) is potent evidence that the Administrator is not to be bound by satisfaction (or nonsatisfaction) of any one standard. Similarly, the ratio of mortgages to assessed value is hardly controlling as tenants would have it. What is required is that the agency view the entire transaction as a whole, neglecting none of the specified factors, to see if the purchase price is a better index of value than assessed value, and is, indeed, *335 a good index of value, before accepting such price as the basis for determining net return. In this analysis, it is not proper to consider one mode of determining the net return base as preferred over another, as tenants and landlord argue. Assessed value is the base unless the purchase price is a good index of value; once it is, the assessed value no longer plays a role.
The business realities make it evident that there was nothing abnormal or distortive in having a subordination clause in the purchase-money mortgage. At least the Administrator was entitled to so conclude.
The refinancing of the old first mortgage was all but inevitable; the only question was whether the seller or the buyer would undertake the task. The old mortgage was about to expire; it had been reduced in principal by amortization, although it is common knowledge that values in the Bast 74th Street area have increased markedly since 1951. The 3¾% interest rate of 1952 would hardly be available in 1962 as even the 5½% interest rate would hardly be available in 1967. It was only natural that the first lien bearing the lowest rate of interest should bear the maximum financing burden for the property rather than the higher risk, higher interest rate, second and third mortgages. These facts of financial life being true, a subordination clause in the purchase-money mortgage was inevitable, unless the seller were to arrange the refinancing before the sale (an unlikely event). Moreover, whatever slight effect the subordination clause might have had on the whole price was offset by the lump-sum payment on account of principal on the purchase-money mortgage so soon after the sale. For all these reasons, it was quite reasonable for the Administrator to conclude that the subordination clause did not render the financing in this sale abnormal.
As for the question whether the buyer must have provided the cash payment or that the seller must have received the cash payment, in sufficient amount to satisfy the specified standard, the answer is in the statute. It explicitly refers to the ‘‘ cash payment received by the seller ” (Administrative Code, §Y51-5.0, g, [1], [a], [1], [ii], [a]). Moreover, at the time of the sale, the seller did receive the cash payment and the buyer advanced it. What happened thereafter is not material so long as there is no reason to suppose that it involved a special benefit *336 to the buyer which would have had the effect of inflating the price. On the contrary, assuming that the arrangement was completely foreplanned, it would tend to hold the price down because the purchase-money mortgage was to be reduced that much sooner. The standards are geared to testing whether financial practices affect the price by increasing it abnormally, and are not concerned with financial practices that do not have such an effect. This is not to deny that in some circumstances, not present in this case, the financing of a buyer’s cash payment might entail an inflation of the price.
As for the ratios of the price to gross income of the property as well as the ratios of mortgages to assessed value, the experience with similar rent-controlled properties in this particular area support the rationality of the Administrator’s conclusions. Particularly in the field of rent-controlled luxury apartments, with the prospect of decontrols based on room-rent formulas and the opportunity for development of cooperatives, market values would likely exceed several times the assessed value. Moreover, this market effect would be within the experience of the Administrator and is demonstrable from the cases before him and in the courts (see Matter of Edwards v. Herman, 17 A D 2d 185,187; Matter of Jackman v. Herman, 34 Misc 2d 995, 996-997, affd. 17 A D 2d 927; Matter of Kaufmann v. Abrams, 141 N. Y. S. 2d 716, 718 [Sup. Ct., N. Y. County, 1955], supra).
Consequently, the present record before the Administrator, coupled with the data available to him from regulation in this area, amply satisfied the test of rationality. Nor was it necessary that his reasoning, which is either detailed or inferable from the material presented to him or created by the agency, be so comprehensive as to provide specific argumentative analysis of each of the statutory factors. Moreover, there are no facts other than those already conceded which might have required findings of fact by a quasi-judicial tribunal, which this agency is not.
Coming now to the essential services issue, enough has already been said to indicate that this was simply an issue of fact for the Administrator to resolve. This he did and again no more specific grounds or findings of fact were needed to be set forth in his opinion. On this score, therefore, it was not necessary for the matter to be remanded to the agency. In so concluding, *337 however, it merits emphasis, as the Administrator argues, that the 16-year quiescence by the tenants is not a directly controlling factor. Quiescence, as has been pointed out by the courts in the past, is relevant on whether the service is essential and not in establishing an estoppel (Matter of R. E. Assoc. v. McGoldrick, 280 App. Div. 202, 204; Matter of Kerbs v. Weaver, 15 Misc 2d 99, affd. 7 A D 2d 839, affd. 6 N Y 2d 781). Under a law which forbids tenant waiver of rights such a theory of estoppel would contradict the nonwaiver (Administrative Code, § Y51-6.0, subd. [a]; § Y51-10.0; N. Y. C. Rent Eviction and Rehabilitation Regulations, § 17; Matter of Payson v. Temporary State Housing Rent Comm., 7 Misc 2d 615, 617, affd. 5 A D 2d 816).
It also merits mention that there is no estoppel or quasi res judicata arising from the prior grant on landlord’s application of an increase of $4 per month per apartment for additional wiring simply because on such application the landlord must also certify that all essential services are being maintained. This occurred with respect to this property and no tenant objection was voiced. Bes judicata is a doctrine based on public policy, largely, if not entirely, confined to judicial aand quasi-judicial tribunals and looks to the reasonable expectations of the parties to a litigation as to the determinations involved (2 Davis, Administrative Law Treatise, § 18.03; Restatement, Judgments, § 70, comment /). The prior wiring application was not made in a quasi-judicial proceeding and was not a contested proceeding in any judicial sense. Moreover, the requirement of certification of maintenance of essential services is simply an incidental regulatory device unless raised by objection to a true issue.
Accordingly, the order of the Appellate Division should be reversed and the determinations of the Rent Administrator should be reinstated, without costs.
Judges Burke, Scileppi, Bergan and Keating concur with Judge Breitel ; Chief Judge Fuld and Judge Van Voorhis concur in result.
Order reversed, without costs, and matter remitted to Special Term for further proceedings in accordance with the opinion herein.