OPINION OF THE COURT
Martin Evans, J.
In this proceeding under CPLR article 78, petitioner seeks *786 judgment annulling the determination of the respondent Superintendent of Insurance which established both primary and two levels of excess premium rates for physicians’ and surgeons’ professional liability insurance for two policy years: July 1, 1985 through June 30, 1986 and July 1, 1986 through June 30, 1987. By amendment of the petition, petitioner also seeks the same judgment with respect to the policy year July 1,1987 through June 30, 1988.
Petitioner Medical Malpractice Insurance Association (MMIA) alleges that the determination made by respondent was arbitrary and capricious; that it was the result of abuse of discretion; that it was made in violation of lawful procedure; that it is in violation of the 5th and 14th Amendments of the US Constitution and that it violates sections 6 and 7 of article I of the NY Constitution.
Petitioner also seeks judgment compelling respondent to establish proper premium rates for those three policy years, in compliance with the Insurance Law.
Petitioner is a nonprofit unincorporated association, first established by the Legislature in 1975 to provide medical malpractice insurance. The members of petitioner at any one time are all the insurance companies which at that time underwrite personal injury liability insurance in the State of New York, and one of the conditions of their doing business in this State is that they are required to be members of MMIA. Presumably if they cease doing that type of business they need no longer be members of MMIA.
Those insurance companies which are members of MMIA are required to make up any deficit which may be incurred by MMIA as a result of its insurance operations.
The rate for the policy year 1984-1985 had been established by the Superintendent based on the findings and recommendations of Honorable Dominick L. Gabrielli, who had served as a Special Hearing Officer for that purpose. Thereafter, the Superintendent promulgated an amendment to regulation 101 (11 NYCRR part 70), which reduced the 1984-1985 rates by 15%.
A hearing on the rates to be established for 1985-1986 was held before Honorable Matthew J. Jasen who sat as a Special Deputy Superintendent. During the pendency of the hearing the Superintendent, on the basis of the evidence and of the experience up tp that time, allowed an interim rate increase of 20% over the base rate. The determination of Judge Jasen *787 was that the rates for the year in question before him should be increased for primary insurance by 86.7%, and for excess insurance by 30% and 20%, respectively, for the two layers of insurance, over the 1984-1985 base rate.
However, before the Superintendent acted upon Judge Jasen’s recommendation, the Legislature, reacting to well-known problems in the malpractice insurance field, enacted Laws of 1986 (ch 266). In general, this was a legislative attempt to begin to resolve the problems that were apparent. Specifically, section 40 of that chapter provided a mechanism which allowed the Superintendent to set the rates for the three policy years of 1985-1988; and in the event the experience of those three years resulted in an actuarially projected deficit, provided for a premium surcharge not to exceed 8% on all policies which commenced in the policy year 1989 and to continue for an indeterminate number of years, to satisfy any projected deficiencies which would then be considered attributable to the rates which had been set for the policy years 1985-1988.
Section 40 also provides that the surcharges shall be deemed to be income earned for the purposes of section 2303 of the Insurance Law.
Acting ostensibly under the authority of this enactment, and using 1984-1985 as a base, the Superintendent determined that the premium increases for the periods in question should be as follows:
Primary Rate Excess Rate
1st Layer 2nd Layer
1985- 86 14% 30% 20%
1986- 87 9% 35% 24%
1987- 88 9% 40% 28%
The matter was referred, by agreement, to Honorable Samuel S. Silverman, to hear the evidence supporting the contentions of the parties and to report to the court.
It is clear from the evidence before the Referee, and he has reported, that the rates fixed by the Superintendent for both the primary and the two excess layers of insurance are entirely inadequate to meet the statutory standards which have been fixed by the Insurance Law. However, the Referee concluded that the determination of the Superintendent was proper, based upon the effect which he thought should be given to section 40.
*788 I
(a)
There are two sets of statutory standards which are applicable.
The first is found in Insurance Law, article 23, § 2303, which provides that, "Rates shall not be excessive, inadequate, unfairly discriminatory, destructive of competition or detrimental to the solvency of insurers.”
The second standard is found in article 55, which, in section 5505 provides that, "(a) The rates * * * shall be subject to article twenty-three of this chapter, giving due consideration to the past and prospective loss and expense experience for medical malpractice insurance written and to be written in this state, trends in the frequency and severity of losses, the investment income of the association, and such other information as the superintendent may require.”
To the extent that the rates are subject to article 23, one must look at section 2301, which sets forth the purposes of article 23. In that connection, it should be noted that while section 2303 sets forth a statement as to what the rates shall not be, subdivision (b) of section 5505 provides affirmatively that the rates shall be "on an actuarially sound basis, be calculated to be self-supporting, be based on reasonable standards”.
There are different purposes for these two sets of standards which otherwise would seem partially to overlap.
Article 23 applies to all types of insurance written by any insurer authorized to do business within the State; by section 2301 it can be seen that the purpose of article 23 is essentially to promote price competition and competitive behavior among insurers. The prohibition of "inadequate” rates under article 23 is, in general terms, designed to prevent unfair and discriminatory practices and also to maintain the availability and reliability of insurers.
(b)
This court does not agree with the contention of the Superintendent that the direction in section 40 (L 1986, ch 266) to the effect that the surcharge shall be deemed to be income for the purposes of section 2303 was intended to override the direction in section 5505 that the rates which were to be fixed *789 by the Superintendent were to be actuarially sound, self-supporting, and based on reasonable standards.
While courts should give deference to an agency’s practical construction of a statute over a period of time (see, e.g., Town of Amherst v County of Erie, 260 NY 361, 369-370), the construction proposed here is one of first impression, and is not entitled to absolute judicial deference, since the ultimate responsibility of interpreting the law rests with the court. (See, Matter of Exxon Corp. v Board of Stds. & Appeals, 128 AD2d 289, 296.)
While section 40 (L 1986, ch 266) was enacted to restrain and stabilize soaring medical malpractice insurance rates, this court does not conclude that the Legislature, to effectuate that result, intended to change the general rules set forth in the Insurance Law. The legislative intent to reduce soaring malpractice rates (see, L 1986, ch 266, § 1) was to be effectuated by many other means, only one of which was to allow the Superintendent of Insurance to fix rates.
It would be impermissible for the Legislature to effectuate that purpose by requiring that the Superintendent act in such a way as to effectuate an unconstitutional result, which would be the case if the statute were to be read to require rates that did not allow a reasonable rate of return to the petitioner or to its members.
Article 55 refers solely to petitioner, which was created by that article. Under section 5505, the rates are required to bé actuarially sound, self-supporting, and are to be based on reasonable standards.
The history of the adoption of the predecessor to article 23 is set forth in Matter of Smith v Wikler (10 AD2d 195). Its purpose was to satisfy the requirements of the McCarranFerguson Act (15 USC §§ 1011-1012) which imposed a moratorium on the application of Federal antitrust laws to the business of insurance, so long as the business of insurance was regulated by State law.
That purpose, now set forth in section 2301, was to provide for the promotion of price competition and competitive behavior; to provide rates that are responsive to market conditions; to improve the availability and reliability of insurance and to regulate competition among insurers. Rates for those purposes were not to be excessive or inadequate or unfairly discriminatory.
Section 2303, which sets the standards for rates under *790 article 23, implements each of those purposes and to insure the availability and reliability of insurance, states that the rates shall not be detrimental to the solvency of insurers. For these purposes, the Superintendent may broadly include all income on all the insurer’s investments of any kind and wherever located.
Thus, an insurer may not be permitted to set an unusually low rate, which might be destructive of competition, or which might lead to insolvency, unless it can be shown that the insurer has sufficient investment income from all sources to be able to promulgate such a low rate.
The Superintendent has taken the position that despite the present insufficiency of the rates, he has legislative authorization to set them at that level by reason of the last sentence of section 40 (L 1986, ch 266), which, he claims, gives him the right to consider the surcharges to be imposed commencing in 1989 as a part of the rate. He claims that these surcharges, if imposed in 1989 and continued to be imposed on each future annual premium until approximately the year 2000, will be sufficient to make up the deficit for the years 1985-1988 which is presently foreseen as a result of his present rate determination.[1]
He bases this on his conclusion that the Legislature, in enacting Laws of 1986 (ch 266), intended that the rates for 1985-1988 period be inadequate, and that the burden of this intended inadequacy be passed on to a succeeding generation.
However, not only is there no clear language which would permit this interpretation, but an examination of section 40 leads to a contrary conclusion.
Specifically, after directing the Superintendent to establish rates for the 1985-1988 period, the Superintendent is directed to cause the insurers to establish segregated accounts for those years for premium payments, reserves and investment income attributable to that period, and to require periodic *791 reports, "to monitor whether the accounts will be sufficient to meet incurred claims and expenses.” (L 1986, ch 266, § 40.)
This language expresses the legislative hope that the rates to be set would be sufficient, under the existing circumstances of general uncertainty in the malpractice insurance field. The language does not support the Superintendent’s position that the Legislature intended that the rates be set so that the accounts would be insufficient for that three-year period.
The court reads section 40 to provide that if the rates proved to be inadequate, only then would the surcharge, if necessary, be imposed; and then only up to 8% of the then allowed premiums.
It is clear that the Superintendent was not to impose the full 8% surcharge, unless and until his monitoring of the accounts toward the end of the 1985-1988 period established a necessity for that action.
From all the evidence, it is apparent that the position of the actuaries for the Superintendent, upon whom he relied, was that the surcharge, beginning in 1989, was to be fixed at 8%; and their calculations of the 1985-1988 rates was based on their present determination that the 8% surcharge would be necessary.
Only if section 40 (L 1986, ch 266) were read to require that the Superintendent make the 8% surcharge determination at the present time, instead of waiting (as § 40 seems to require) for the periodic reports during the 1985-1988 period, might the position of the Superintendent be sustained.
(c)
He has not contended, nor was there any evidence adduced before the Referee, that even with the surcharge, there will be an adequate return to enable the members of petitioner to make any return on their compelled investment, at a reasonable profit, which they are entitled to do. (See, Insurance Law § 2304 [a].) Indeed, if the Legislature had intended to prohibit a reasonable return on investment, there would be serious question as to the constitutionality of the Legislation. (See, Prendergast v New York Tel. Co., 262 US 43;[2] Brooks-Scanlon *792 Co. v Railroad Commn., 251 US 396, 399.)* [3]
That MMIA was created as a nonprofit corporation and that membership in MMIA by the member insurers is a condition of their doing business in this State does not give the State, acting through the Superintendent’s rate-making powers, the power to require them to invest in or to maintain a losing business for the benefit of others.
(d)
None of the foregoing considers the question of insolvency as a result of the income and expenses up to the 1985-1986 policy year. While the petitioner was not insolvent in the equity sense (that is, it is able to pay its present debts as they mature) the statutory test set forth in section 1309 (a) of the Insurance Law is somewhat different. Respondent has conceded, during argument, that the definition in section 1309 is applicable.
While the statute does use the words "unable to pay its outstanding lawful obligations as they mature in the regular course of business”, the statutory tests for this are set forth in the next following phrase: "as shown by an excess of required reserves and other liabilities over admitted assets, or by its not having sufficient assets to reinsure all outstanding risks * * * after paying all accrued claims owed”. (Insurance Law § 1309 [a].)
The evidence is undisputed that by this test MMIA is insolvent.
In Stewart v Citizens Cas. Co. (61 Misc 2d 809, revd 34 AD2d 525, affd 27 NY2d 685, cert denied 401 US 910) insolvency was defined as an excess of reserves over admitted assets. It is clear that the test looks to the future maturation of present and potential claims, against the presently admitted assets.
The Referee found that the proposed rates would not impermissibly impair the solvency of MMIA; it seems clear from the *793 evidence that petitioner’s solvency is, and will continue to be impaired. If it was the legislative intent to so modify not only section 5505 of the Insurance Law, but long-standing general principles of the requirement of solvency of insurance companies, it is not apparent from the statute.
n
It is difficult for the court, as it was for the Referee, to determine what the basis for the determination of the Superintendent was. The Superintendent’s actuaries, who presented him with their conclusions based upon various "scenarios” of rate structures were likewise unable to determine the basis for his action. The scenarios themselves were, as described by one of this actuaries, "not an analysis so much as it is one scenario”, and depends upon future results which themselves rest on a speculative foundation with no basis in past experience. This is not an actuarial basis.
There was, therefore, no proper actuarial basis, or other basis before the Superintendent which could serve as a foundation for his determination.
CONCLUSION
Based on the foregoing analysis, the court concludes that the report of the Referee should not be accepted, and that the determination of the Superintendent should be set aside.

. The Referee found, and both sides appear to agree, that there was no rational basis for the Superintendent’s decision in setting excess rates. The Referee concluded that the 8% future surcharge should be considered in setting those rates, but found that even with that surcharge, there was not even a prima facie showing that the excess rates were proper.
There was no showing as to how much of the 8% surcharge will be applied, in futuro, to the primary rates and how much to the excess rates, from which this court can only conclude that there was no basis for the optimistic conclusion by the Superintendent that the 8% surcharge will ultimately make up the 1985-1988 deficit.

. "They [the temporary rates] were final legislative acts as to the period during which they should remain in effect pending the final determination; and if the rates prescribed were confiscatory the Company would be deprived of a reasonable return upon its property during such period, without *792 remedy, unless their enforcement should be enjoined. Upon a showing that such rates were confiscatory the Company was entitled to have their enforcement enjoined pending the continuance and completion of the rate-making process.” (Prendergast v New York Tel. Co., 262 US 43, 49.)

. "A carrier cannot be compelled to carry on even a branch of business at a loss, much less the whole business of carriage * * * The plaintiff may be making money from its sawmill and lumber business but it no more can be compelled to spend that than it can be compelled to spend any other money to maintain a railroad for the benefit of others who do not care to pay for it.” (Brooks-Scanlon Co. v Railroad Comma., 251 US 396, 399.)