72 N.Y.2d 753 (1988)
In the Matter of Medical Malpractice Insurance Association, Respondent,
v.
Superintendent of Insurance of the State of New York, Appellant.
Court of Appeals of the State of New York.
Argued November 16, 1988.
Decided December 15, 1988.
Robert Abrams, Attorney-General (Richard G. Liskov, O. Peter Sherwood and Lawrence S. Kahn of counsel), for appellant.
T. Richard Kennedy, Larry P. Schiffer and Michael A. Knoerzer for respondent.
Chief Judge WACHTLER and Judges SIMONS, KAYE, ALEXANDER, HANCOCK, JR., and BELLACOSA concur.
*756 TITONE, J.
In response to the continuing upward spiral of medical malpractice liability insurance, the Legislature, in 1985 and again in 1986, passed substantive and procedural rules designed to restrain increases in medical and dental malpractice premiums (see, L 1985, ch 294; L 1986, ch 266). The underlying legislative concern was that increasing malpractice premiums *757 threaten the public health by discouraging physicians from initiating or continuing the practice of medicine in New York. The legislative reforms have been challenged on many fronts (see, Medical Malpractice Ins. Assn. v Cuomo, 138 AD2d 177, lv granted 143 AD2d 548; Alliance of Am. Insurers v Cuomo, 854 F.2d 591). This article 78 proceeding involves one discrete aspect of the Medical Malpractice Reform Act of 1986 (L 1986, ch 266).
Specifically, petitioner challenges the premium rates set by the respondent, Superintendent of Insurance, pursuant to section 40 of the temporary insurance rate-stabilization program (L 1986, ch 266, § 40). The issue presented is whether the primary and excess premium rates established by the Superintendent pursuant to section 40 are inconsistent with other statutory requirements (see, Insurance Law §§ 5505, 2303) and thus arbitrary and capricious. We hold that the Superintendent's interpretation of section 40 was reasonable, that the rates set in reliance on this interpretation were not arbitrary or capricious, and that petitioner's alleged claim of confiscation does not lie. Accordingly, we reverse the order of the Appellate Division which affirmed the Supreme Court judgment annulling the Superintendent's determination, and reinstate that determination.

I.
Petitioner, the Medical Malpractice Insurance Association (MMIA), is a nonprofit unincorporated association which was created by the Legislature in 1975 in response to the withdrawal of many private insurance companies from the medical malpractice market in New York. MMIA was created for the express purpose of providing medical malpractice insurance, which is no longer readily available in the voluntary market (L 1975, ch 109, § 17; see, Insurance Law § 5502 [c], [d]). MMIA is required to provide primary medical malpractice insurance to physician applicants with policy limits of $1 million per claim, and an annual aggregate limit of $3 million (Insurance Law § 5502 [e] [1]). In 1985, the Legislature mandated that MMIA provide excess coverage of at least $1 million per claim, and $3 million for all claims in any one policy year (L 1985, ch 294, § 17). Since 1975, the Superintendent has set premium rates pursuant to provisions of the Insurance Law requiring the lowest possible rates consistent with the maintenance of MMIA's solvency, and the establishment of reasonable *758 reserves and surpluses (Insurance Law § 5505 [a], [b]; see also, Insurance Law § 2303).
From 1980 to 1985, MMIA's rate increased by over 200%. To alleviate this critical problem, in 1985 and 1986, the Legislature implemented various changes in the prosecution of medical malpractice liability cases (L 1985, ch 294; L 1986, chs 266, 682). Significant changes were made in payment of damages, attorneys' fees, pretrial discovery, and the application of joint and several liability for noneconomic losses (see generally, Note, New York's Medical Malpractice Insurance Crises  A New Direction for Reform, 14 Fordham Urban LJ 773 [1986]).
A hearing on the rates to be established for 1985-1986 was held before a Special Deputy Superintendent (SDS). Following extensive hearings, the SDS found that MMIA was entitled to an 86.7% increase in physician and surgeon rates. However, before recommendations could be implemented, the Governor signed the Medical Malpractice Reform Act of 1986 (L 1986, ch 266). Pursuant to section 40 of this Act, the Superintendent was directed to establish rates for each policy year commencing July 1, 1985 through June 30, 1988. In addition, section 40 authorized the Superintendent, commencing July 1, 1989, to impose an annual surcharge of up to 8%, if needed, to satisfy any actuarially projected deficiency resulting from the rates that he had established for each of the 1985-1988 policy years (L 1986, ch 266, § 40). Section 40 provides that the surcharges shall be deemed income earned for the purposes of Insurance Law § 2303 which requires that premium rates be calculated in such a way as to maintain solvency.[1]
*759 Relying on section 40, the Superintendent promulgated the Sixth, Seventh, Eighth and Tenth Amendments to Regulation No. 101 (11 NYCRR 70.8) establishing primary and excess premium increases for 1985-1986, 1986-1987, and 1987-1988. The allowed increases have been established as follows:[2]

 Primary Rate Excess Rate
 1st Layer 2nd Layer
 1985-1986 14% 30% 20%
 1986-1987 9% 35% 24%
 1987-1988 9% 40% 28%

The Superintendent has not yet established a surcharge rate, since, under section 40, such a determination can only be calculated after any deficiency arising from the prior years is determined. However, in order to facilitate the calculation of deficiencies arising from the three policy periods, and the corresponding future surcharge needed to offset the prior deficiencies, the Superintendent directed the establishment of segregated accounts for premium payments, reserves and investment income attributable to each of the policy periods. Critically, in setting these rates, the Superintendent concededly considered that a surcharge of up to 8% could be imposed in the future. Both parties agree that without this consideration of future surcharges, both the primary and the two excess layers of insurance are entirely inadequate to meet the statutory standards of solvency under the Insurance Law (see, Insurance Law §§ 5505, 2303).
MMIA brought the present article 78 proceeding to challenge the Superintendent's approach, contending that his interpretation of section 40 is unreasonable, and has resulted in rates which are not actuarially sound, self-supporting, based upon reasonable standards or consistent with statutory standards of solvency. MMIA also claims that the rates are confiscatory and will result in an unconstitutional taking of property in violation of the State and Federal Constitutions (US Const 5th, 14th Amends; NY Const, art I, §§ 6, 7).
*760 Implementation of the rates was stayed on August 12, 1986, and the parties agreed by stipulations to interim primary and excess rates for the 1985-1988 policy years pending exhaustion of all appeals in this proceeding. The issues raised in the proceeding were then submitted to a Referee, who agreed with the Superintendent that future surcharges should be considered in fixing present rates, and concluded that the Superintendent, in setting the 1985-1988 primary rates, properly relied upon actuarial figures derived, in part, from the original figures supplied by the SDS. However, concerning the excess rates, the Referee recommended a remand to the Superintendent for further explanation since he found the record before him to be insufficient.
Supreme Court rejected the Referee's report and set aside the determination of the Superintendent. The court disagreed with the Superintendent's interpretation of section 40, reasoning that the language directing insurers to establish segregated accounts for the 1985-1988 policy years expressed a "legislative hope that the rates to be set would be sufficient, under the existing circumstances of general uncertainty in the malpractice insurance field", without any surcharge at all (137 Misc 2d 785, 791). The court ruled that future surcharges were not even to be considered by the Superintendent, "until his monitoring of the accounts toward the end of the 1985-1988 period established a necessity for that action" (id.). The Superintendent's interpretation was found to be at odds with the "self-supporting" requirement for rates contained in section 5505 (Insurance Law § 5505). The court also rejected the Referee's findings that the rates established would not impermissibly impair the solvency of MMIA, and questioned the constitutionality of section 40. Finally, the court gave short shrift to the Superintendent's actuarial calculations concerning future rate structure. The court simply classified the figures as "scenarios", and concluded they were insufficient. A divided Appellate Division affirmed on Supreme Court's opinion, the dissenting Justices agreeing with the Superintendent's interpretation of section 40, particularly in view of its provision treating surcharges as earned income for the purposes of section 2303 (see, Insurance Law § 2303 [requiring that all earned income be included in determining whether *761 the rates comply with the statutory requirements of solvency]).[3]

II.
At issue in this appeal is whether the Superintendent's consideration of future surcharges in the fixing of present rates was consistent with section 40, and the statutory requirements of solvency set forth in sections 2303 and 5505 of the Insurance law. Section 5505 (b) of the Insurance Law, which governs MMIA, provides in pertinent part: "All rates shall be on an actuarially sound basis, be calculated to be self-supporting, be based upon reasonable standards * * * The premiums shall be fixed at the lowest possible rates consistent with the maintenance of solvency of the association and of reasonable reserves and surplus therefor." Section 2303 provides that the "[r]ates shall not be * * * detrimental to the solvency of insurers." As the parties agree, without the consideration of future surcharges in determining present rates, the rates set by the Superintendent would be inadequate and would not satisfy the statutory requirements of solvency.
In reviewing the Superintendent's interpretation of his legislative authorization in section 40, we defer to his special expertise and views, unless the interpretation is irrational or *762 runs counter to the clear wording of the statutory provision (see, New York Pub. Interest Research Group v Town of Islip, 71 N.Y.2d 292, 303; Matter of New York Pub. Interest Research Group v New York State Dept. of Ins., 66 N.Y.2d 444, 448; Kurcsics v Merchants Mut. Ins. Co., 49 N.Y.2d 451, 459; Ostrer v Schenck, 41 N.Y.2d 782, 785). We conclude from the statute and its history that the Superintendent's interpretation of the statute is reasonable and should be sustained.
The Superintendent's position is based upon the last sentence of section 40, which provides: "The surcharges authorized herein shall be deemed to be income earned for the purposes of section two thousand three hundred three of the insurance law." He also relies on Insurance Law § 2303, which provides that "[i]n determining whether rates comply with the foregoing standards, the superintendent shall include all income earned by such insurer". Construing these provisions together, the Superintendent concluded that the anticipated future surcharges, which are designated as income earned, should be considered both in determining present rates and in calculating the solvency of MMIA as required by sections 2303 and 5505. This view of the statutory language is reasonable. If future surcharges were not to be accounted for until actually received beginning in 1989, then the last sentence of section 40 would be superfluous, since moneys actually received would undoubtedly be deemed income earned at that time. Thus, the Legislature must have intended that the future surcharges be considered on an accrual basis similar to the treatment of investment income (see generally, McKinney's Cons Laws of NY, Book 1, Statutes §§ 92, 94).
Further, the legislative history is clear. Governor Cuomo noted in his approval memorandum that "the bill authorizes the Superintendent of Insurance to establish rates for a three-year period (July, 1985-June, 1988) that will provide a measure of badly needed premium stability as these reforms begin to take hold. In establishing these premium levels, the Superintendent is authorized to consider the availability of surcharges in future years that could be imposed, beginning in 1989, to restore any potential deficiency created during the premium stabilization period" (1986 NY Legis Ann, at 161 [emphasis added]).
It is clear that temporary rate stabilization is designed to complement the numerous remedial measures codified in 1985 and 1986 (L 1985, ch 294; L 1986, ch 266). Section 40 is *763 designed to bridge the gap and allow the other reforms to start taking effect. Further, as pointed out by the dissenting Justices, if petitioner's interpretation of section 40 is correct, section 40 would mean nothing and do nothing. If the Superintendent cannot account for future surcharges in calculating present rates, then the current rate increase would have to be approximately 86.7%  the rate recommended by the SDS. Nothing in chapter 266 reveals that the Legislature intended such extraordinary increases in premiums from 1985 through 1988. To the contrary, as chapter 266, section 1, plainly states, the purpose of the chapter is to "reduce the cost of [medical] malpractice insurance * * * [and] significantly reduce physician and health care system costs in the short-run" (L 1986, ch 266, § 1), during which time the positive actuarial effects of the prophylactic measures in the 1985 and 1986 legislation can begin to serve their purpose.
Thus, we conclude that the Superintendent correctly interpreted section 40 by considering future surcharges.

III.
We next consider whether the Superintendent's reliance upon his actuary's calculations was arbitrary or capricious (see, CPLR 7803 [3]; Matter of Colton v Berman, 21 N.Y.2d 322; Matter of Schwartz v Corcoran, 118 AD2d 355, 361). Supreme Court gave short shift to respondent's actuarial data, simply labeling them as "scenarios", and concluding that the rates were not set on an actuarial basis as required by Insurance Law § 5505 (b). However, as the Referee found, actuarial data existed, and the Superintendent's rate decisions were based on such data. It is axiomatic that a court reviewing the determination of an agency may not substitute its judgment for that of the agency and must confine itself to resolving whether the determination was rationally based (see, Matter of Procaccino v Stewart, 25 N.Y.2d 301). We conclude that in annulling the Superintendent's determination the courts below exceeded their review powers.
Throughout the course of this litigation, the parties' actuaries have disagreed on almost everything. Just as they disagree concerning the impact of the surcharge on future deficits, the actuaries also disagree about the potential beneficial impact of the 1985 and 1986 reform legislation. A disagreement among actuaries, however, is not evidence that the Superintendent's acceptance of one set of conclusions was arbitrary (see, Matter of New York State Council of Retail Merchants v Public Serv. Commn., 45 N.Y.2d 661, 672-674; *764 Montgomery v Daniels, 38 N.Y.2d 41, 53).
Respondent's actuarial projection used the SDS's 86.7% suggested rate increase as a starting point. The purpose of this calculation was to determine whether an 8% surcharge to future premiums, commencing with the policy year 1989-1990, would ultimately offset deficiencies arising from the curtailed rates set for policy years 1985-1988. Based on the Superintendent's calculations, it was shown that the deficit caused by the 1985-1988 rates could be cured by approximately the year 2000. While the computation was founded upon numerous assumptions, including future interest rates, projected decreases in severity of claims due to accompanying legislative reforms,[4] and the Superintendent's willingness to permit "adequate" increases beginning in 1988-1989 and the following years, the use of such assumptions does not render the Superintendent's conclusions irrational.
As to the rates for layers of excess coverage, the Referee concluded that the record as to how the rates for excess policies were calculated was not complete, and thus recommended remitting this question to the Superintendent for further explanation. We disagree (see, Matter of Colton v Berman, 21 N.Y.2d 322, 334, supra).
As he has consistently done in the past, the Superintendent fixed over-all rates for excess layers as percentages of the rates approved for primary coverage. In addition, the Superintendent's actuarial witness testified that while excess programs at inadequate rates would increase the deficit, there would be greater surcharge income in future years, and that the two would offset each other. This alone should have been sufficient (see, Matter of Procaccino v Stewart, 25 N.Y.2d 301, supra). Moreover, this court can take judicial notice of the Regulatory Impact Statement (see, CPLR 4511 [b], [c]) which *765 the Superintendent filed in connection with the Ninth Amendment to Regulation No. 101 while this case was pending before the Supreme Court (see, 11 NYCRR 70.8). This statement explains how the same factors used by the actuaries in setting primary rates were also used in setting excess rates, and consequently supplies an adequate rational basis for the excess rates (see, New York State Register, May 6, 1987, at 10-11; see also, CPLR 7803; Matter of Colton v Berman, 21 N.Y.2d 322, supra).

IV.
Accepting the Superintendent's interpretation of section 40 and his actuarial projections, it is apparent that MMIA may well be forced to run at a deficit until the surcharges result in recoupment in approximately the year 2000. Petitioner argues that requiring MMIA to run a continued deficit for this length of time proves that the Superintendent's decision is arbitrary and capricious, and, alternatively, results in a confiscation of property in violation of the Fifth and Fourteenth Amendments of the United States Constitution (US Const 5th, 14th Amends) and article I, sections 6 and 7 of the New York State Constitution (NY Const, art I, §§ 6, 7).
According to the express language of section 40, there is no time limit within which the deficits must be made up. Section 40 merely provides that the 8% surcharge "shall continue for such period of time as shall be sufficient to satisfy such deficiency" (L 1986, ch 266, § 40). As previously noted, the deficit attributable to the diminished rates for 1985-1988 on primary and excess policies will be recouped by about the year 2000. This 15-year period for recoupment is not unreasonable, since according to respondent's chief actuary, the established rates coupled with the 8% surcharge after 1989, will enable MMIA to remain liquid and pay claims as they come due, at least through the year 2010. More importantly, medical malpractice claims are "long-tailed", so that claims made on policies written between 1985 to 1988 will not, on average, be payable until after 1995-1998. Thus, it is entirely conceivable that the deficit will be made up while some losses attributable to policies written and premiums collected in 1985-1988 are still unpaid.[5] The combination of the "long-tailed" nature of medical malpractice claims along with the *766 other statutory reforms promulgated under the 1985 and 1986 acts makes the long-term deficit entirely reasonable. If the reforms have their expected salutary effect, the collection of unnecessarily high premiums will be avoided. If the reforms are not as successful as expected, the surcharge provides a sensible method of meeting any deficiency that may develop over the long period within which claims mature.
Finally, we reject MMIA's claim that section 40 is confiscatory as to it. MMIA was created by the Legislature of the State of New York in order to provide much needed medical malpractice insurance. MMIA is a creature of statute, and all of its rights, obligations and duties have been defined by the Legislature (see, Insurance Law art 55). MMIA may operate only for fixed periods of time and only if the Superintendent determines that medical malpractice insurance is not readily available in the voluntary market (Insurance Law § 5502 [d]). In addition, MMIA's operations are subject to the Superintendent's extensive and direct control (Insurance Law § 5503 [c]). Importantly, although all insurance companies writing personal injury insurance in New York are required to be members of MMIA as a condition of transacting business in this State (Insurance Law § 5502 [a]), MMIA is a nonprofit unincorporated association which is a legal entity separate and distinct from its members (Insurance Law § 5502 [b]). Moreover, all funds and reserves of MMIA are held and invested separately from its members (id.).
Thus, as a statutory entity created by the Legislature, the State's broad police power can be implemented to foster affordable medical malpractice coverage, with the possibility that MMIA will operate under a deficit. Indeed, such deficits were expressly contemplated in the enabling legislation (Insurance Law §§ 5507, 5509). In this regard, even if MMIA will operate at a continued loss, such a loss is not confiscatory vis-à-vis MMIA (see, Brooks-Scanlon Co. v Railroad Commn., 251 US 396, 399 ["It is true that if a railroad continues to exercise the power conferred upon it by a charter from a State, the State may require it to fulfil an obligation imposed by the charter, even though fulfilment in that particular may cause a loss."]; Missouri Pac. Ry. Co. v Kansas, 216 US 262, 276, 278; *767 Atlantic Coast Line v North Carolina Corp. Commn., 206 US 1). Since the individual insurance companies which are members of MMIA and are required to make up any deficit which may be incurred by MMIA (Insurance Law § 5507 [b])[6] are not parties to this proceeding, we do not consider the degree to which the Superintendent's regulations, or the underlying statutory scheme, may be confiscatory as to them (see, Alliance of Am. Insurers v Cuomo, 854 F.2d 591, supra).
Accordingly, the order of the Appellate Division should be reversed, with costs, the petition dismissed and the determination of the Superintendent of Insurance reinstated.
Order reversed, etc.
NOTES
[1] Section 40 provides in pertinent part that: "The superintendent of insurance shall establish rates for policies providing coverage for physicians and surgeons medical malpractice for the periods commencing July first, nineteen hundred eighty-five and ending June thirtieth, nineteen hundred eighty-eight. The superintendent shall direct insurers to establish segregated accounts for premiums, payments, reserves and investment income attributable to such premium periods and shall require periodic reports by the insurers regarding claims and expenses attributable to such periods to monitor whether such accounts will be sufficient to meet incurred claims and expenses. On or after July first, nineteen hundred eighty-nine, the superintendent shall impose a surcharge on premiums to satisfy any actuarially projected deficiency that is attributable to the premium levels established pursuant to this section for such periods; provided, however, that such annual surcharge shall not exceed eight percent of the approved adequate rate and that such annual surcharges shall continue for such period of time as shall be sufficient to satisfy such deficiency * * * The surcharges authorized herein shall be deemed to be income earned for the purposes of section two thousand three hundred three of the insurance law" (L 1986, ch 266, § 40).
[2] When this action was initiated only the Sixth and Seventh Amendments had been passed, and thus only these amendments were challenged. However, the parties have agreed by stipulation to allow petitioner to supplement its petition and challenge the provisions of the Eighth and Tenth Amendments.
[3] Following the Appellate Division's affirmance, section 40 was amended as follows: "Notwithstanding any provision of the insurance law, rates already established and to be established by the superintendent pursuant to this section are deemed adequate if such rates would be adequate when taken together with the maximum authorized annual surcharges to be imposed for a reasonable period of time whether or not any such annual surcharge has been actually imposed as of the establishment of such rates" (L 1988, ch 184, § 19).

The amendment was made retroactive to July 8, 1986, the day before the rates challenged in this proceeding were initially promulgated (L 1988, ch 184, § 22). In addition, other amendments extend the Superintendent's authority to establish rates pursuant to section 40 through June 30, 1991, and increases the maximum surcharge to 25%, beginning in the 1991-1992 policy year, and continuing until any deficiencies have been recouped (L 1988, ch 184, § 19; ch 186).
After these enactments, respondent sought to renew and/or reargue before the Appellate Division. The court granted renewal but adhered to its original decision, the same two Justices again dissenting. By stipulation, both the appeal from the original decision, and the appeal from the order adhering to that decision, have been consolidated. Since we conclude that the Superintendent's original interpretation of the unamended version of section 40 was proper, we need not address the effects, if any, of the subsequent amendments.
[4] Severity refers to the amount of losses on such claims. Importantly, section 5505 (a) provides that MMIA's rates shall give "due consideration to the past and prospective loss and expense experience for medical malpractice insurance written and to be written in this state, trends in the frequency and severity of losses, the investment income of the association, and such other information as the superintendent may require." (Insurance Law § 5505 [a].) Thus, section 5505 (a) instructs the Superintendent to extrapolate upon trends in medical malpractice insurance. It cannot be deemed unreasonable, as a matter of law, to consider the potential beneficial impact of the accompanying reforms on the severity of future claims.
[5] In its Regulatory Impact Statement, the Superintendent points out that the average payout time for excess claims is significantly greater than 10 years. "Since many excess losses for policies written in policy years 1985/86 and 1986/87 will not be payable until beyond the year 2000, the excess deficit will be made up while some losses attributable to excess policies written during policy years 1985/86 and 1986/87 remain unpaid" (New York State Register, May 6, 1987, at 11).
[6] MMIA, from its very inception, has been required to maintain a stabilization reserve fund for the purpose of offsetting deficits and "for reimbursement to the association's members for payment of any deficit arising out of the operations of the association" (Insurance Law § 5509 [a]). While recent legislation has been passed affecting the stabilization fund (L 1986, ch 266, § 11), MMIA has not raised any claims concerning the stabilization fund in this action (see, Medical Malpractice Ins. Assn. v Cuomo, 138 AD2d 177, lv granted 143 AD2d 548).